[No. 16980.  *En Banc.*  February 23, 1923.]

WILSON & COMPANY, *Respondent,* v. WALKER D. HINES, *Appellant.*[1]

APPEAL (426)—REVIEW—HARMLESS ERROR—NOT AFFECTING RESULT. Error cannot be predicated upon a departure in the reply where the cause was tried below upon the issues made by the affirmative defense and the denials thereof in the reply.

CARRIERS (30-1)—OF GOODS—ACTION FOR LOSS—DEFENSES—BURDEN OF PROOF. While improper loading relieves a carrier from liability for loss in transit of a part of shipment of oil, the burden is upon the carrier to show that the loss occurred because of improper loading and that burden is not met, where it appears that the shipment was made in a large cylinder mounted on car trucks having an outlet valve at the bottom, and the loss occurred through the freezing of water in the outlet pipe; that the water was either in the bottom before the loading, or settled there from the usual amount of water in that quantity of oil; and it further appears that the loading was done without unscrewing the cap at the end of the

[1]Reported in 213 Pac. 5.

escape, in the usual manner at the place of shipment, where many trucks of the same kind were loaded.

SAME (32)—ACTION FOR LOSS—DEFENSES—BURDEN OF PROOF— EVIDENCE—SUFFICIENCY. The duty of the carrier is to furnish a car that is suitable and safe for the carriage of the particular kind of commodity undertaken to be carried, which requires a type able to encounter the ordinary risks of transportation.

Appeal from a judgment of the superior court for King county, Gilliam, J., entered June 7, 1921, upon findings in favor of the plaintiff, in an action for conversion, tried to the court. Affirmed.

*Bogle, Merritt & Bogle,* for appellant.

*Leopold M. Stern, Hymen Zettler,* and *Eugene C. Luccock,* for respondent.

MITCHELL, J.—On January 18, 1918, Mitsui & Company, Limited, loaded an Oregon-Washington Railroad & Navigation Company's tank car with 94,420 pounds of soya bean oil, at the Great Northern dock in Seattle, Washington. From the dock the car of oil was taken over the line of the Great Northern Railway to the line of the Oregon-Washington Railroad & Navigation Company, whereupon, on January 22, 1918, the defendant issued its order bill of lading covering the oil for transportation to Chattanooga, Tennessee, delivery to be made on the order of the shipper, Mitsui & Company, Limited, "notify Wilson & Company, Alton Park Station, Chattanooga." Wilson & Company became the owners of the bill of lading, and upon receiving the car at Chattanooga found it to contain only 26,820 pounds of oil, and this action was brought to recover for the loss. Upon the trial of the case without a jury, findings of fact and judgment were entered for the plaintiff, from which the defendant has appealed.

The assignments of error fall under three heads.

(1) The first contention is that, over proper and timely objections, the court erroneously permitted a departure in respondent's reply from the cause of action alleged in the complaint. The complaint is short and, in effect, alleges the delivery of 94,420 pounds of oil to the appellant at Seattle, freight prepaid, for transportation to Chattanooga, Tennessee; that only 26,820 pounds were delivered and that there was a failure to deliver 67,600 pounds; and that by reason of such failure to deliver, the oil was lost, together with a proportionate share of the freight charges and war tax, stating the amount of the loss. These allegations of the complaint were denied. The answer further set up several affirmative defenses, one of which was the improper loading of the car by the shipper, which it was alleged was the proximate cause of the loss of the oil. This was denied by the reply. The affirmative matter in the reply that was objected to as a departure from the allegations of the complaint was in reply to the allegations of one of the affirmative defenses, and, without setting out the two pleadings, there appears to have been no departure. In our view, however, it is immaterial because the case was tried and disposed of in the trial court, just as we do here, upon the allegations of the complaint and the denials thereof, together with the affirmative defense of improper loading by the shipper, causing the loss, and the denials thereof in the reply.

(2) The second point made by the appellant is that the respondent has no right to maintain the action because, as it is claimed by the appellant, the respondent did not become the holder of the order bill of lading until after the loss of the oil. If such be the law, which we need not decide, it has no application here; as

examination of the evidence shows that it supports the trial court's finding that the respondent was the owner and holder of the bill of lading by paying therefor on February 2, 1918; while the uncontroverted proof shows that the loss of the oil occurred on February 11, 1918.

(3) The final claim of error assigned by the appellant is that the loss occurred because of the improper loading of the oil by the shipper, which relieved it from its common law liability of safe delivery. It may be accepted as a generally recognized rule that improper loading or packing constitutes ordinarily such a fault on the part of the shipper as will relieve a common carrier from its almost absolute liability for goods it undertakes to carry, in those cases at least where the improper loading or packing consists of internal latent defects of which the carrier does not know, and from which loss or damage ensues to the goods in the ordinary course of handling and transportation. 4 R. C. L., Carriers, § 203, p. 732; Hutchinson on Carriers (2d. ed.), § 333; *Revilla Fish Products Co. v. American-Hawaiian Steamship Co.*, 77 Wash. 49, 137 Pac. 337; *Gulf, W. T. & P. R. Co. v. Wittnebert*, 101 Tex. 368, 108 S. W. 150, 14 L. R. A. (N. S.) 1227.

Since the general rule of liability for loss is against the carrier upon its being shown that the carrier received the shipment and failed to deliver it or a part of it, the burden is upon the carrier to show that the cause of the loss is one of the excepted causes, such as improper loading or packing. With these rules in view, it is necessary to examine into the substantial facts of the case.

The receptacle that contained the oil was a large cylinder mounted on car trucks. It had an opening in the top called the dome, covered with a metal cap,

through which the oil is discharged into the tank. It had an outlet valve at the bottom of the tank, used in unloading. The valve was constructed with two wings which served as guide-rods attached to the valve proper to permit it to drop into place, called seating the valve, which was manipulated by turning a lever, in plain view on the inside of the dome, connected with a valve rod extending from the lever to the valve. There was a spring at the top of the rod which tended to force the rod downward and keep the valve seated so as to prevent the escape of the lading. Underneath the valve there was a metal projection called the boot of the valve casting, extending downward about fifteen inches below the tank, closed at the bottom end by a nut and gasket. The cubical contents of the boot or drain pipe was a little less than two gallons.

It satisfactorily appears that the loss of the oil occurred on February 11, 1918, at Fairfield, Nebraska, where, in the course of transportation, the car was left on a side track for several days during freezing weather, and that the freezing of water in the outlet pipe at the bottom of the tank broke off the cap at the extremity of the outlet pipe and at the same time dislocated the valve, through which the oil escaped upon the moderation of the weather on February 11, until the flow was checked by railroad employees.

There seems to be no doubt that had there been no water in the outlet pipe there would have been no trouble because of the weather; that is, there would have been no freezing had the lading all been confined above the valve. The testimony shows that 94,420 pounds of oil contained 8 or 9 gallons of water, which because of its greater weight would readily settle to the bottom of the oil and remain there, in a tank filled

as this one was, notwithstanding the usual motion and jarring of the car in the course of transportation.

Obviously the water was already in the outlet pipe at the time the car was delivered to the shipper for loading, or it settled there from the oil after the loading, and the controlling question is, who was responsible therefor?

There was no record of the loading of this car, other than the date, nor testimony as to what particular person loaded it. An employee, at that time under the superintendent and foreman of the oil dock that loaded the car for Mitsui & Company, Limited, testified that he had no recollection of loading this car, but that, when he did load such a car, he saw to it that the valve was seated, but that he did not unscrew the cap at the end of the escape pipe to ascertain whether or not there was anything in the outlet chamber. He further testified that, at that time, there were five persons engaged in loading tank cars at the dock, and that he did not know what method the others used in loading them. That the existence and purpose of the valve and the manner in which it was manipulated were well known to the parties under whose supervision the car was loaded, there seems to be no doubt. The superintendent or foreman at the dock, called as a witness on behalf of the respondent, testified that, when a car was set in for loading, "the first thing the man would do would be to go up on top of the tank and remove the dome cap, and see that the valve was properly seated, and also then he would screw the cap underneath the tank, if it was loose, screw it up tight. He would put the spout in the car and proceed to load, provided that the car was in condition as to cleanliness." He further testified at the conclusion of his testimony, by question and answer, as follows:

"Ques. (By the court) As I understand it, your custom was to load the car without making any investigation to see whether or not the valve was permitting any oil to run down into the outlet pipe? Ans. Yes, sir."

In January, 1918, there was, and for some months had been, very considerable business in the shipment of this kind of oil by loading it into the same kind of tank cars at the dock in Seattle. Remembering that the burden is on the carrier to show improper loading or packing, the most that this testimony shows is that the shipper, by its agents, loaded the oil in the usual and customary way, from which it would seem to follow that water was already in the outlet pipe at the time the car was delivered to the shipper, or that it settled there after the car was loaded in the customary way, possibly because of some defect in the valve.

The rule is well founded in the law and in common business experience that it is the duty of the common carrier to supply cars that are suitable and safe for the carriage of the particular kind of commodity undertaken to be conveyed, which implies not only that it must be of a type so constructed as to be able to encounter the ordinary risks of transportation, but also must be perfect in all its parts. 4 R. C. L., Carriers, p. 682, § 156.

We conclude the appellant has not met the burden imposed upon it in this case, and that the judgment appealed from is correct.

Affirmed.

MAIN, C. J., PEMBERTON, FULLERTON, PARKER, HOLCOMB, TOLMAN, and BRIDGES, JJ., concur.