[No. 18285. Department Two. March 20, 1924.]

AMERICAN COTTON OIL COMPANY, *Appellant,* v. JAMES C. DAVIS, *as Agent of the United States, substituted for John B. Payne, Respondent.*[1]

CARRIERS (32)—ACTION FOR LOSS—EVIDENCE—SUBSEQUENT CONDITIONS—ADMISSIBILITY. In an action for the loss of a shipment of oil through latent defects in the valve of the tank car furnished by the shipper, it is admissible for the defendant, in support of its affirmative defense of improper loading, to show the loss of a second shipment of oil some six months subsequently from the same defect in the car, where it is shown that the condition of the valve remained substantially the same as at the time of the first loss.

APPEAL (456)— REVIEW — HARMLESS ERROR — ADMISSION OF EVIDENCE—ERROR CURED BY INSTRUCTIONS. Error cannot be assigned upon opening statement of counsel as to what he expected to prove, where no exceptions were taken at the time and the jury were admonished not to regard any testimony offered but not received in evidence.

APPEAL (124)—PRESERVATION OF GROUNDS—SPECIFICATION OF OBJECTION TO EVIDENCE. Objection to the answer of a witness on the ground that it went beyond the scope of the question cannot be urged on appeal where the only objection below was a motion to strike because the witness had no knowledge of the subject.

CONTINUANCE (19, 25) — GROUNDS — SURPRISE — CONDITIONS ON GRANTING. In an action for the loss of a shipment of oil, in which the

[1]Reported in 224 Pac. 23.

answer alleged that the loss was due to a defective valve in the tank car furnished by the shipper, and to the shipper's failure to properly close the valve, the plaintiff cannot claim surprise and the right to a continuance without terms, through defendant's evidence as to the condition of the valve six months later when a subsequent loss occurred in a shipment in the same car; especially where no showing was made as to the availability of witnesses to meet the proof during a number of days prior to the close of the trial.

CARRIERS (32)—OF GOODS—ACTION FOR LOSS—INSPECTION OF CARS —DEGREE OF CARE—CUSTOM OF OTHER ROADS—EVIDENCE—ADMISSIBILITY. Upon an issue as to the negligence of a railroad company in not inspecting the valve cap of a tank car furnished by the shipper, it is admissible for the defendant to show that the car was inspected along the line in the same manner that such cars are usually and customarily inspected by railroad companies, where it supports the claim of the defendant that the function of the valve was not to bear the load, but merely to prevent leakage, and that a more rigid inspection of the valve cap would not have disclosed the defect in the valve and was not required in the exercise of reasonable care under the circumstances.

SAME (28)—CARS FURNISHED BY SHIPPER—LIABILITY. A shipper of oil in tank cars assumes the responsibility of all defects in a tank car furnished by him which are invisible to the agent of the carrier who accepts the shipment, and which cannot be discovered by ordinary observation or inspection.

Appeal from a judgment of the superior court for King county, Griffiths, J., entered June 3, 1922, upon the verdict of a jury rendered in favor of the defendant, in an action for damages for the loss of goods shipped. Affirmed.

*Carroll B. Graves* and *Guie & Halverstadt,* for appellant.

*Thomas Balmer, Edwin C. Matthias,* and *Alfred J. Clynch,* for respondent.

MITCHELL, J.—On December 16, 1918, Mitsui & Company delivered to the United States Railroad Administrator (Great Northern Railroad) at Everett, Washington, a privately owned tank car containing soya bean oil consigned to the American Cotton Oil Com-

pany at Chicago. This action was brought to recover damages for the non-delivery of that shipment. The complaint is in the usual form in such cases. The answer admits the receipt and non-delivery of the shipment and contains appropiate denials of other things stated in the complaint, and then affirmatively alleges:

"That the failure of the defendant to deliver the contents of said car, as consigned, was due to the act or default of the shipper or owner thereof, in loading, shipping and forwarding the same in a defective and insecure car, and in failing to properly close the valve or outlet in the bottom of said car: that said car was furnished by the plaintiff and the shipper for said shipment, and was an improper and unsafe car for the transportation of soya bean oil, in that the valve and other apparatus for closing the bottom outlet of said car were loose, insecure and defective and said valve and outlet were not securely closed by the shipper, and thereby the contents of said car were permitted to leak and run out of said car as a result of their own inherent nature."

The case was tried to a jury, and the plaintiff has appealed from a verdict and judgment in favor of the defendant.

The tank car in question was of the usual construction. It had a dome through which to load oil into the car. It had an outlet valve in the bottom of the car to be used in unloading that was manipulated for seating and unseating it by a rod extending to the dome of the car. Below the valve and connected with it there was a discharge pipe, with threads and a cap at the bottom end. Witnesses for the respondent, consisting of railroad men and shippers, testified that it was the function of the valve to hold the lading. They testified that, while the discharge pipe was intended to retain slight seepage or leakage past the main valve, it was primarily and principally intended for the use of hose

to be attached in the process of unloading, and that the cap was necessary to protect the threads by which the hose was attached. Some of them also testified that the discharge pipe would likely hold the lading if imposed upon it. During the eastward movement of the car, it, with others, was given customary inspection, lastly at a division point in Montana, at which time there was no sign of leakage. Shortly thereafter the conductor, from the rear platform of the caboose, noticed the leakage of oil. The train was stopped, and notwithstanding prompt efforts by the crew, the remainder of the oil was entirely discharged before the flow could be stopped. This occurred before daylight, December 24, 1918. The car was left on a siding and an inspector sent to examine it, but was unable with the tools he had to remove the dome cover. However, by thrusting a switch through the drainage pipe from the bottom, he discovered that the main or so-called plunger valve in the bottom of the car was open all the way around "approximately an inch or an inch and a quarter, or something like that." The car was returned to Seattle. It was refilled with oil by Mitsui & Company for shipment east over the same line about January 22, 1919.

On the second trip, the outlet cap of the car again came off, causing the loss of the entire load of oil at a point about one hundred and twenty-five miles further east than the place at which the first loss occurred. Upon the happening of the second loss, January 28, 1919, the car was given a careful inspection. The evidence showed that the main valve was open about an inch, and that the valve stem was so thoroughly rusted to the yoke through which it was threaded that it could not be moved or operated from the outside, and that it required the extreme strength of a man with an eighteen-inch Stillson wrench, with his back braced in-

side the car, to seat or close the valve. There is no dispute that such condition existed, and many witnesses, including those who made the inspection, testified that the corrosion found in the yoke through which the stem passed was so extensive that it must have existed and held the valve open when the car was loaded with oil for the first shipment. It appears that, prior to the December shipment, the car had been empty for five or six months since its last service, which was in the transportation of molasses over a different railroad. The condition of the valve could not be seen through a load of oil even if the dome cover were removed. The loading of the car was done by the shipper through its own agents and employees on its own premises, without any supervision by the carrier.

It is assigned that the court erred (1) in permitting statements to be made by counsel for the respondent, and evidence to be placed before the jury, of the loss of a second load of oil by the same tank car on January 28, 1919, in Montana, near the same place of the first loss, and (2) in admitting evidence of the condition of the car at the time of the second loss, January 28, 1919.

It is readily apparent from the issues made by the pleadings that the principal controversy arose on the affirmative defense. It involves the rule that improper loading constitutes ordinarily such a fault on the part of the shipper as will relieve a common carrier from its common law liability for the safe delivery of goods it undertakes to carry, especially where the faulty loading, in car load lots, consists of internal defects of which the carrier does not know, and from which the loss or damage ensues to the goods in the ordinary course of handling and transportation. *Wilson & Co. v. Hines,* 123 Wash. 643, 213 Pac. 5; 4 R. C. L., Carriers, § 203; Hutchinson on Carriers (2d ed.), § 333. The burden of this defense was on the respondent, and

since it did not own or furnish the car, had in no way supervised the loading of it, and made no examination of it with respect to the latent defect chargeable with the loss, the necessity of proving that defect, the condition of the valve, as discovered by the inspection on January 28, 1919, and the reason for its condition, are obvious.

A fair statement of the rule is found in 10 R. C. L., Evidence, §112:

"As to proof of the condition of things subsequent to an accident, the rule seems to be that where the condition has not changed, the evidence is admissible. But unless the evidence relates to a time so close to the accident that it is apparent the condition has not changed, evidence as to the condition at a later period will not be received. The exceptions to this are where, from the substance of the matter, the lapse of time would not make any material difference."

In the case of *Williams v. City of Lansing,* 152 Mich. 169, 115 N. W. 961, evidence of the condition of the sidewalk six months after the accident was allowed. In *Jacksonville S. E. R. v. Southworth,* 135 Ill. 250, 25 N. E. 1093, the condition of a railroad track, found on taking up the track six months after the accident, was allowed. In it the court said:

"While, as a general rule, evidence of defects in the track so long after the injury would not be admissible, *yet being connected with other proof showing that the condition remained substantially the same, it becomes competent.*"

In *Whiting Middleton Const. Co. v. Preston,* 121 Md. 210, 88 Atl. 110, a condition found to exist more than a year later was permitted, the court saying:

"And whether this rule [condition subsequent to the date of accident] is to be followed depends largely upon the character, nature and condition of the place or thing of which evidence of its condition is sought to be

given, for, where it may be reasonably presumed that during a given interval after an accident there has been no material change in the condition of the place or thing, evidence of its condition after that interval is admissible to show its condition at the time of the accident, *especially where at the latter date its condition is such as to negative any correct inference of recent changes.* Ency. of Evidence, vol. 8, page 905.''

Many other cases might be cited to the same effect. The rule is applicable here, it being shown by an abundance of evidence that the time intervening between the date of the first loading and the date of the inspection that was made could not make any very material difference. That is, there were a great number of witnesses, well qualified by experience to speak on the subject, who testified that the corrosion which held the valve open at the time of inspection could not have developed between the dates mentioned, but must have existed when the car was loaded for the shipment, the loss of which was the cause of this action.

There can be no serious question about the applicability of the rule to the condition of the car at the time the inspection was made, but it is further insisted by the appellant that the court erroneously permitted counsel to make statements and offers of proof, and witnesses to testify, concerning the actual loss of the second shipment of oil as distinguished from the faulty condition of the valve at that time. The record in this respect is rather long and somewhat involved, but, upon a careful examination of it, we are satisfied that there was no prejudice. In the opening statement of counsel for the respondent to the jury, it was said that such proof would be furnished. No exception was noted on behalf of the appellant to that statement. In the course of the trial, the court held that proof of the second loss would not be allowed, but in the meantime,

in the absence of the jury, an offer was made to prove the second loss, and at another time a similar offer was made in the presence of the jury, the latter causing a lengthy colloquy between respective counsel and the court, whereupon, on the denial of the offer, the court, at the request of counsel for the appellant, at once instructed the jury to "bear in mind that any testimony offered by either counsel during the progress of the case, not received in evidence by the court, is not to be regarded by you as evidence in the case at all." General advice to the same effect was given in the final instructions to the jury. Another instance at the trial was that of the answer of a witness who went beyond the scope of a question, and referring to the condition of the valve at the time of the second loss, stated that, when he looked, the valve was submerged in oil, which was running out. To this answer only a motion to strike was made on the ground "as not showing the witness had any knowledge of the condition of the valve." In our opinion, neither of these two assignments of error is meritorious.

Upon the announcement by the court during the trial that respondent would be permitted to show the rusted condition of the valve at the time of the second loss, the appellant claimed surprise, that it was a departure from the allegations of the answer, and moved for a continuation as a matter of right. The ruling was that a continuance would be granted upon condition that the appellant pay all accrued taxable costs, which was refused by the appellant, who assigns error because a continuance was not granted without terms. No motion to make more definite and certain, nor interrogatories, were made or presented against the allegations of the affirmative defense, among other things, to the effect that the failure to deliver the goods was due to the default of the shipper in loading and forward-

ing the oil in a defective and insecure car, and in failing to properly close the valve or outlet in the bottom of the car. We think the pleading was sufficient to let in the proof, and besides, no showing was made at that time, nor in presenting the motion for a new trial, of the availability of witnesses to meet respondent's proof. The motion was disposed of prior to appellant's rebuttal, and a number of days prior to the close of the trial.

Assignments 4 and 7 are discussed together in the brief on behalf of the appellant. The one is that the court erred in admitting evidence of custom among railroad men not to test outlet caps on tank cars in course of transportation. The other one is the refusal of an instruction embodying the theory contended for by assignment number 4. The evidence on behalf of the carrier was that, all along the line from the starting point, the tank car was given the usual inspection by observation to ascertain if there was any leakage through the cap of the discharge pipe. In cross-examination of these several witnesses, the appellant sought to develop the idea that, in addition to observation, proper inspection required that the caps be tested and examined by some appliance, such as a wrench. In this situation, the respondent introduced the testimony of a number of witnesses of considerable experience on other railroads to show that the uniform practice in the inspection of such cars was identical with that given by the respondent in this case. It is well contended by the respondent that the evidence was proper in support of its claim as to the function and purpose of the drainage pipe and cap, and that it was proper evidence to go to the jury in determining if due care required as rigid examination and inspection of the cap as though the purpose of the cap was to hold the burden of the load and not simply to take care of leak-

age. The case is similar in principle to *Alabama & V. R. v. American Cotton Oil Co.*, 249 Fed. 308, which involved the loss of oil shipped in a tank car. In that case the circuit court of appeals, in reversing a judgment upon a directed verdict in favor of the shipper because the facts should have been submitted to the jury, referred to the kind of car used by saying:

"Underneath the valve was a cap that screwed from the bottom of the car. The cap was not designed to hold the contents of the car, but would have had that effect if the screw threads had not been defective. The unscrewing of this cap would not have the effect of emptying the car, the valve being in place."

Then speaking further of the evidence, the court said:

"The evidence also indicates that the cap underneath, while it might have held the oil, was not intended for that purpose, and that an inspection which would have disclosed a deficiency in this cap would not have suggested the necessity of making any change or repair in the car; it appearing that not infrequently these caps were unscrewed in transit."

Appellant relies on authorities such as the case of *Williams v. Spokane Falls & N. R. Co.*, 39 Wash. 77, 80 Pac. 1100. That was a personal injury case. The trial court gave an instruction that explained, first, the kind of care required in transportation of passengers, and then stated as follows:

" 'It is not sufficient that the carrier has employed the same character of appliances, has exercised the same degree of care in their inspection, has taken the usual and ordinary precautions to avoid accidents, and that its trains were operated in the same manner as is customarily and ordinarily done by other carriers under like circumstances. The carrier is bound to use such quality of appliances and to exercise such care in the use of those appliances as human foresight would

2—129 WASH.

suggest as a measure to protect the passengers from harm, and the carrier cannot exonerate itself from exercising this ordinary vigilance for the safety of its passengers, which the law requires by showing that other carriers have customarily and ordinarily done the same thing, unless the jury find from the evidence that this manner of doing the things was such as the highest degree of care, prudence and caution required so as to prevent injury to passengers.' ''

In discussing the second portion of the instruction it was said:

''And the carrier cannot escape the responsibilities for the violation of a duty which the law imposes upon him by pleading the violation of that duty by other carriers. If the custom of railroad companies was to be accepted as the measure of care, then there would be no stimulus to improve, each carrier relying, not upon his own exertions to exercise extraordinary care, but upon the custom of other carriers.''

Therefrom it is argued on behalf of the appellant that the evidence of inspection by other railroads similar to that made by the respondent in this case was improperly admitted. The rule announced in that case is clearly not applicable to the point presented here. The gist of the instruction in that case is ''and the carrier cannot *exonerate* itself from exercising this ordinary vigilance for the safety of its passengers, which the law required by showing that other carriers have customarily and ordinarily done the same thing;'' and the effect of what was said in the discussion of that instruction is ''and the carrier cannot *escape* the responsibilities for the violation of a duty which the law imposes upon him by pleading the violation of that duty by other carriers.'' The respondent is not contending that the proof, so seriously objected to, *exonerated* it from the duty of proper inspection, nor that it warrants *escape* from the responsibilities for the

violation of a duty. To fall under the disfavor of the doctrine of that case it would be necessary, upon the respondent having shown that the standard practice of inspection by railroads generally was the same as that employed in this case, for it to then contend that thereby it was exonerated and should be allowed to escape all responsibility.

This kind of evidence is admissible, not because a railroad, or all of them, can fix a rule by which to measure due care, prudence and caution, a rule of decision or standard of judgment, but as a matter of evidence assisting the jury to judge what sort of conduct is required to discharge the duty imposed by law. Wigmore on Evidence (2d ed.), § 461; *Chicago Great Western R. Co. v. McDonough,* 161 Fed. 657; *Frankford & Bristol Turnpike Co. v. Philadelphia & Trenton R. Co.,* 54 Pa. 345, 93 Am. St. 708; *Benson v. New York, N. H. & H. R. Co.,* 23 R. I. 147, 49 Atl. 689; *Bridger v. Asheville & S. R. Co.,* 27 S. C. 456, 3 S. E. 860; *Gulf, C. & S. F. R. Co. v. Harriett,* 80 Tex. 73, 15 S. W. 556; *Southern R. Co. v. Blanford's Adm'x,* 105 Va. 373, 54 S. E. 1; *Burns v. Sennett,* 99 Cal. 363, 33 Pac. 916.

Assignments 5, 6, 8 and 9 consist of the refusal to give requested instructions and the giving of others, to which exceptions were taken. Without setting them out, they may be considered and disposed of generally. This case is not like that of *Louisville & N. R. Co. v. Carr,* 77 Fla. 469, 81 South. 779, wherein the court considered the loss of oil from a tank car that had just been used three consecutive trips over the defendant's line, and that was being used under a contract by which the carrier agreed to maintain the car and make necessary repairs and charge the same to the owner. Nor is it like the case of *Central of Georgia R. Co. v. Chicago Varnish Co.,* 169 Ala. 287, 53 South. 832, in which the tank car was rented to the carrier by the consignee

upon an agreement that the carrier should keep it in repair at the consignor's cost. While it appears in the present case that, during the period of time this car was in the possession of the respondent, there were repairs consisting of brake shoes and sill step rivets made by the respondent and charged to the consignor, the repairs were made, not because of any contract with the consignor, but because of the requirements of the safety appliance acts of the United States governing railroads engaged in interstate commerce as to their use of cars whether privately owned or not.

The general rule, which is applicable to this case, is as stated in 10 C. J., p. 121, Carriers:

"In general the loading and unloading of goods are under the carrier's control, and he is responsible for any loss or injury incident thereto. Nevertheless when the shipper assumes the responsibility of loading the car and fails to see that it is properly prepared for the transportation of the particular article which he is loading, he assumes responsibility for all defects in loading which are necessarily invisible to the agent of the carrier who accepts the freight, or which he cannot discern by ordinary observation or such inspection as he can readily make, and if any loss or injury results from defective loading the carrier is not liable."

The refusal to give the instructions requested and the giving of those objected to were in line with the views expressed in this opinion.

Assignments 10 and 11 relate to the denial of a motion for a new trial and the entering of the judgment in favor of the respondent. What has already been said herein makes it unnecessary to further notice these two assignments.

Affirmed.

MAIN, C. J., FULLERTON, and BRIDGES, JJ., concur.