[No. 20199. Department Two. March 16, 1927.]

WESTERN MACHINERY EXCHANGE, *Appellant*, v. NORTHERN PACIFIC RAILWAY COMPANY, *Appellant*, WYNOOCHE TIMBER COMPANY, *Respondent*.[1]

[1] CARRIERS (30-1)—OF GOODS—ACTIONS FOR LOSS—DEFENSES—EVIDENCE—SUFFICIENCY TO OVERCOME PRIMA FACIE CASE. Where a *prima facie* case of damages against a railroad company was made by proof of the wreck of a locomotive crane, received by the company for transportation in apparent safe condition, the fact that it broke from its fastenings and tipped over, does not establish the railroad company's affirmative defense that the wreck was due solely to the manner in which it was prepared for shipment, or relieve the company from the burden of showing that the wreck was not due to its negligence, where there was evidence to the effect that the wheels of the crane left the tracks on a curve and ran on the ties some distance before the crane tipped over and that the wreck may have been caused by some other condition than an inherent weakness in the fastenings of the crane.

[2] DAMAGES (62, 112)—MEASURE OF DAMAGES—PERSONAL PROPERTY—EVIDENCE—ADMISSIBILITY. In an action for damages to a locomotive crane, evidence of the cost of repairing it is competent on the measure of damages—the difference between its value before and after the injury.

[3] DAMAGES (62, 110)—MEASURE OF DAMAGES—INJURY TO PERSONAL PROPERTY—LOSS OF EARNINGS. In an action against a railroad for damages to a locomotive crane, transported by the company, the loss of its use while repairs were being made is a proper element of the damage, and admissible in evidence.

¹Reported in 254 Pac. 248.

[4] Parties (15) — Defendants — Persons Who May Be Joined — Defendants Liable on Different Theories. In an action for damages to a locomotive crane, wrecked in transporting it, it is not a misjoinder of parties defendant to sue both the carrier and the bailee for hire who prepared it for shipment, though each may be liable on somewhat different theories; in view of the dispute as to the cause of the injury and the blame therefor, and the fact that the trial was to the court.

[5] Bailment (3)—Care and Use of Property and Negligence of Bailee. Upon a bailment for hire of a locomotive crane, which the bailee was to transport to its premises and return to the bailor, in the absence of any express contract to return it in as good condition as received, the bailee is bound only to exercise reasonable care in its protection, and is not liable for damages resulting from the negligence of the railroad company in transporting it.

Cross-appeals from a judgment of the superior court for Grays Harbor county, Abel, J., entered May 4, 1926, upon findings against the defendant railway company and in favor of the defendant Wynoochee Timber Company in an action for damages, tried to the court. Affirmed.

*Geo. T. Reid, L. B. da Ponte* and *A. Emerson Cross,* for appellant Northern Pacific Railway Company.

*Theodore B. Bruener,* for appellant Western Machinery Exchange.

*John C. Hogan,* for respondent Wynooche Timber Company.

Parker, J.—The plaintiff, machinery exchange, a corporation, commenced this action in the superior court for Grays Harbor county seeking recovery from the defendants railway company and timber company for loss claimed as the result of the wrecking and damaging of a large locomotive crane belonging to the machinery exchange, while it was being transported by the railway company over its line at a point about eight miles east of Aberdeen in that county. The

claim of the machinery exchange is against the rail-
way company as a common carrier, and against the
timber company as a bailee of the crane for hire.   A
trial upon the merits in the superior court sitting
without a jury resulted in findings and judgment
awarding to the machinery exchange recovery against
the railway company in the sum of $3,250, and deny-
ing to the machinery exchange any recovery against
the timber company.   The railway company has ap-
pealed to this court from the judgment in so far as
recovery is so awarded against it.   The machinery ex-
change has appealed to this court from the judgment
in so far as it is denied recovery against the timber
company.

The crane is self-propelling over an ordinary rail-
way track, though at a very slow rate of speed. When
being transported any considerable distance, it is
moved by railway locomotive power as an ordinary
railway car is moved.   The steel boom, some sixty
feet long, and the cab and engine therein, are mounted
on a platform which in turn is mounted upon wheeled
trucks; the platform and trucks presenting much the
appearance of a railway flat car.   The boom, cab and
engine are mounted on rollers running upon a circular
track, the diameter of which is about the same as the
width of the platform.   This circular track is situated
in the middle of the platform, thus rendering the boom,
engine and turret capable of horizontally revolving as
a turret.   The cab, engine and boom are so balanced
on the circular track as to maintain an upright posi-
tion, even when the boom is extended at right angles
to the platform and track, the boom being balanced by
the weight of the cab and engine on the opposite side
from the boom.   When the machine is transported any
considerable distance as a railway car, the boom is

removed and placed on other cars and the cab and engine are secured in position lengthwise on the platform; since, if allowed to revolve on the circular track and come crosswise of the railway track, when the boom is detached, the center of gravity would fall outside of the track and cause the whole to upset.

About July 5, 1924, the machinery exchange, the owner of the crane, leased it to the timber company for an indefinite period at a rental of fifteen dollars per day. The crane was then on a sidetrack of the railway company at Aberdeen. It was understood that the timber company was to take the crane from there and have it transported by way of the railway company's line to the timber company's logging railway connection at the Wynooche spur, some ten miles east of Aberdeen; the timber company to return the crane to Aberdeen when through with it and pay the freight charges to the railway company both ways. About July 8, 1924, the timber company accordingly received the crane at Aberdeen and shipped it to Wynooche where it was received from the railway company by the timber company in good order. During this outgoing journey, the railway company had some trouble with the crane, in that the cab and engine were inclined to revolve on the circular track and disturb the center of gravity so as to threaten upsetting; this evidently because of not being sufficiently securely fastened to the platform. This fastening seems to have then been made only by wooden wedges driven between the surface of the platform and the under side of the cab near its end furthest away from the circular track.

After using the crane about thirty days, the timber company returned it to the railway company at Wynooche spur for shipment back to the machinery exchange at Aberdeen. Before so re-shipping the crane,

the timber company, in addition to driving wedges under the sides of the cab to secure it in position on the platform, also placed in a vertical position on each side of the platform and the cab, they being the same in width, a wooden piece about five inches square and some four feet long securing these pieces snugly against the side of the platform and the cab by an iron rod one inch in diameter running over the platform and under the cab and through each piece with washers and nuts on each end of the rod. This method of securing the cab in proper position on the platform was considered safe and appropriate by those who were handling the crane, one of whom was an experienced former employee of the machinery exchange.

The railway company having received the crane at Wynooche spur, so prepared for return shipment, put it into one of its regular freight trains en route to Aberdeen, about eight cars back from the locomotive. When the train had proceeded a mile or two, and while rounding a somewhat wide curve to the right, a brakeman on the engine, looking back on the right hand side of the train, that is, on the inside of the curve, saw the cab of the crane swing out a short distance. The train was then moving about fifteen miles per hour. He immediately notified the engineer who brought the train to a stop, but before it came to a stop, the cab of the crane swung out approximately at right angles to the track and the whole of it, including its trucks, turned over, lifting the couplings out from the adjoining cars, but doing no serious damage to the adjoining cars. There is testimony to the effect that the wheels of the crane car left the rails and ran on the ties some distance before turning over. This is shown by evidence of marks on the ties, such as car wheels make when running on the ties. These wheel

marks appeared as having been made by the wheels on both sides of the crane car.

[1] The crane, so damaged, was removed to Aberdeen and the machinery exchange received it in that condition. It was by the machinery exchange caused to be repaired at a necessarily incurred, actual expense of $2,950. This the trial court allowed as an item of recovery, and also allowed three hundred dollars as an item of recovery for loss of use of the crane while being repaired. In this manner, the $3,250 award of the judgment was made up. There is not here presented any question touching the payment of the freight or the payment of the rent during the time the timber company used the crane. These obligations have been fully discharged by the timber company in accordance with its renting contract with the machinery exchange.

It is apparent from the allegations of the complaint of the machinery exchange that it sought recovery as against the railway company upon the theory of the general common law liability of a common carrier, for the loss or damage to goods in its charge for shipment; and that, having shown that the crane arrived and was delivered to the machinery exchange by the railway company in a damaged condition, its liability for such damage was thereby established, subject to be defeated only by an affirmative showing in behalf of the railway company absolving it from liability. Counsel for the railway company concede this common law rule of liability, but contend that, since the crane was upon its own wheels and prepared for shipment by the timber company, the agent of the machinery exchange so far as the railway company was concerned, when in apparently good condition for shipment, the railway company is not liable for damages resulting

from such prepared condition of the crane for shipment; and that the damage to the crane was caused solely by the manner of its preparation for shipment. This is an affirmative defense, as to which the burden of proof is upon the railway company. The trial court found against the railway company, as follows:

"That, when the defendant the Northern Pacific Railway Company, as a common carrier, received and accepted said locomotive crane at the Wynooche Spur for shipment to Aberdeen, which it did do, after an inspection of the same, and knowing and understanding as it did, the exact manner in which said locomotive crane was prepared for shipment and the manner of its fastenings and the manner of its preparation for shipment being open, self evident and apparent, . . . it, the said Northern Pacific Railway Company, under the circumstances assumed the responsibility for the safe transportation of the said locomotive crane to Aberdeen, Wash."

No finding was made as to what the trial court conceived to be the cause of the wrecking of the crane, evidently viewing the situation as one of failure of proof to support the railway company's contention that the wrecking of the crane was the result of causes for which it was not responsible. True, the evidence does indicate that the wrecking of the crane might have been caused by the giving way of the fastenings placed to prevent the cab turning because of the inherent weakness of those fastenings, in view of the ordinary strain which would be put upon them by the crane car passing over an ordinary railway track. But the evidence also indicates that the wrecking of the crane might have been caused by some other condition present at the time of the wreck, not at all connected with any defect in the crane car or the securing of the crane thereon. For instance, it is conceivable that the crane car left the rails and proceeded some distance upon the

ties before the shifting of the cab upon the crane car, and that the jarring incident to the wheels of the crane car leaving the track may have been the cause of the shifting of the cab of the crane. Thus, we think the trial court was justified in concluding that the railway company had not sustained the burden of affirmatively showing that the cause of the wrecking of the crane was something for which the railway company was not responsible.

Three decisions of this court have been called to our attention upon which counsel for both sides seem to place some reliance. We notice them in order. In *Revilla Fish Products Co. v. American-Hawaiian S. Co.,* 77 Wash. 49, 137 Pac. 337, there was drawn in question a loss of fish oil by leaking from barrels in which it was shipped, the shipper having furnished the barrels and put the oil in them, thus preparing the oil for shipment. One defense was, improper and insufficient containers. The trial was by a jury, resulting in verdict for the defendant. Upon the appeal to this court, the verdict and judgment were reversed because of erroneous instructions. Disposing of the case, Judge Morris, speaking for this court, said:

"The appellant was entitled to recover, having established its loss, unless the respondent was excused from liability by reason of the fact that the oil was not shipped in proper containers, which caused the loss; . . ."

This was the only legal proposition there announced having any application to our present controversy. In *Wilson & Co. v. Hines, as United States Railroad Administrator,* 123 Wash. 643, 213 Pac. 5, there was drawn in question a loss of soya bean oil by leaking from a tank car. The car was loaded at Seattle by the shipper, Mitsui & Company, for shipment to Wilson & Company at Chattanooga, Tennessee. The case was tried

without a jury resulting in findings and judgment for the plaintiff. The applicable law was stated by Judge Mitchell, speaking for the court, as follows:.

"It may be accepted as a generally recognized rule that improper loading or packing constitutes ordinarily such a fault on the part of the shipper as will relieve a common carrier from its almost absolute liability for goods it undertakes to carry, in those cases at least where the improper loading or packing consists of internal latent defects of which the carrier does not know, and from which loss or damage ensues to the goods in the ordinary course of handling and transportation. 4 R. C. L., Carriers, § 203, p. 732; Hutchinson on Carriers (2d. ed.) § 333; *Revilla Fish Products Co. v. American-Hawaiian Steamship Co.*, 77 Wash. 49, 137 Pac. 337; *Gulf, W. T. & P. R. Co. v. Wittnebert*, 101 Tex. 368, 108 S. W. 150, 14 L. R. A. (N. S.) 1227.

"Since the general rule of liability for loss is against the carrier upon its being shown that the carrier received the shipment and failed to deliver it or a part of it, the burden is upon the carrier to show that the cause of the loss is one of the excepted causes, such as improper loading or packing."

The outlet under the tank of the car was so constructed that the contents were to be held by a valve seated in the upper end of the outlet. A short distance below the valve at the end of the pipe outlet below the tank was a cap screwed onto the end of the pipe. This was kept in place mainly for the purpose of protecting the threads upon the end of the pipe which were there for the purpose of attaching a hose to be used in unloading the car by draining from the tank. In this short pipe had accumulated water which, in the course of the journey, froze and by expansion unseated the valve and also broke the cap at the lower end. When the ice thawed, this permitted the oil to escape, causing the loss complained of. Notwithstanding the shipper loaded the car and notwithstanding the shipper's fail-

ure to drain the lower pipe below the valve by temporarily removing the cap at the time of the loading, the railway company was held liable for the loss which was ultimately caused by the freezing of the water, the unseating of the valve and the breaking of the cap. This court by an *en banc* decision affirmed the finding and judgment of the trial court in that case. In *American Cotton Oil Co. v. Davis, as United States Railroad Administrator,* 129 Wash. 24, 224 Pac. 23, there was drawn in question a loss of soya bean oil by leaking from a privately owned tank car loaded by the shipper. There was a verdict for the defendant. No question was made upon appeal as to the evidence supporting the verdict holding the carrier liable. Observations made during the course of the opinion render it plain that the view of the law announced in the above quotation from *Wilson & Co. v. Hines* was adhered to. We think these decisions lend support to the conclusion we here reach, that the trial court was warranted in concluding that the railway company has not made such showing as to absolve it from liability for the safe delivery of the crane to the machinery exchange at Aberdeen.

[2]   Contention is made in behalf of the railway company that the evidence is insufficient to sustain the measure of recovery awarded in this case, in that there was no evidence as to the difference between the value of the crane before and after its wrecking. This contention seems to be rested upon the theory that there was no opinion evidence touching such difference in value. While such difference in value is the true measure of damage (*Alexander v. Barnes Amusement Co.,* 105 Wash. 346, 177 Pac. 786; *Poole's Seed & Imp. Co. v. Rudene,* 117 Wash. 150, 200 Pac. 1104; *Church Mfg. Co. v. American Security Bank,* 130 Wash. 575, 228

Pac. 518; *Oros v. Allen,* 133 Wash. 268, 233 Pac. 314),
we have held that opinion testimony is not the only
kind of proof which may be introduced to show such
difference in value. In *Madden v. Nippon Auto Co.,*
119 Wash. 618, 206 Pac. 569, there was drawn in ques-
tion the measure of damage to an automobile, where,
upon appeal, we held that the cost of repairs to put it
in the condition it was in before being damaged was a
proper element to be considered in the measure of such
damage. In so holding, we said:

"In support of its own case on the question of the
amount of the damages suffered by the automobile, the
appellant offered to show the actual cost of repairing
it, its subsequent sale, and the price received for it at
such sale. Objection was interposed and sustained to
the testimony, and this ruling furnishes the founda-
tion for the appellant's second assignment of error.
If we are correctly advised, the court based its ruling
upon the case of *Alexander v. Barnes Amusement Co.,*
105 Wash. 346, 177 Pac. 786, in which we held that the
measure of damages for injuries to personal property,
where the property was only partially destroyed, was
the difference between the market value of the prop-
erty immediately before and immediately after the in-
jury; the trial court construing the case to mean that
the only testimony competent to prove such values was
the opinions of witnesses having expert knowledge in
such matters. But if this be the ground of the holding,
the trial court has misconstrued our meaning. We did
not there deny, nor intend to deny, the right of either
party to resort to any legitimate evidence to show the
relative values. In the case of an automobile, many
injuries are of such a nature that they can be made
whole by repairs. The value of the automobile after
the injury would in such an instance necessarily be the
value of the automobile before the injury, less the cost
of the repairs, plus the value of the use of the auto-
mobile during the time it takes to make the repairs, and
in such a case no other showing need be made to prove
the damages."

In the following decisions, cost of repairs was recognized as evidence of measure of damages: *Anderson v. McLaren,* 114 Wash. 33, 194 Pac. 828; *Poole's Seed & Imp. Co. v. Rudene,* 117 Wash. 150, 200 Pac. 1104; *Madden v. Nippon Auto Co.,* 119 Wash. 618, 206 Pac. 569; *Knudson v. Bockwinkle,* 120 Wash. 527, 208 Pac. 59. This, we think, is a sound rule of practical application when it is apparent that the actual, fair cost of repair of the damage falls far short of the total value of the thing damaged, and the repair puts the damaged property in the same condition as before being damaged, which, we think, this record warranted the trial court in concluding as to this damaged property.

[3]   Some contention is made in behalf of the railway company that there should not have been any award of damages on account of the loss of the use of the crane by the machinery exchange during the time necessarily consumed in the repairing of it. We have recognized loss of use as an element of damage in such cases in the following of our decisions: *Anderson v. McLaren,* 114 Wash. 33, 194 Pac. 828; *Madden v. Nippon Auto Co.,* 119 Wash. 618, 206 Pac. 569; *Norris v. Hadfield,* 124 Wash. 198, 213 Pac. 934, 216 Pac. 846; *Kirby v. American Railway Express Co.,* 137 Wash. 241, 242 Pac. 24. We think such allowance is proper in this case, although cases might arise wherein such allowance would not be proper.

[4]   Some contention is made in behalf of the railway company that there was a misjoinder of parties, in that it and the timber company were joined as defendants. While recovery against these two defendants was sought by the machinery exchange on somewhat different theories as to their respective liability, it seems plain that, at all events, the liability arose be-

cause of the single incident of the wrecking of the crane. This, we think, under the modern liberal rule of allowing the joinder of parties defendant, constitutes such a situation as entitled the machinery exchange to join these defendants and seek relief as against both of them in this action. In any event, it seems plain to us that the trial court did not err to the prejudice of the railway company in allowing the case to so proceed, particularly in view of the fact that it was tried before the court without a jury. 30 Cyc. 127.

[5] Some contention is made in behalf of the machinery exchange as against the timber company that it was at all events liable as for special bailment, upon the theory that the timber company's contract with the machinery exchange was unconditionally to return the crane to Aberdeen in as good condition as when received. We think it is plain that no such express contract was entered into by the timber company, but that it became an ordinary bailee for hire; that is, a bailee for the mutual benefit of itself and the machinery exchange, and thus liable to exercise only ordinary care in the protection of the crane while in its possession. This, we think, the evidence clearly shows that it did, not only while the crane was in actual use, but in the preparing of it for re-shipment to the machinery exchange. The trial court expressly found that as to the latter the timber company was not guilty of any negligence. 6 C. J. 1121.

We conclude that the judgment of the trial court must be affirmed. It is so ordered. The machinery exchange shall recover its costs against the railway company, and the timber company shall recover its costs against the machinery exchange.

MACKINTOSH, C. J., TOLMAN, BRIDGES, and ASKREN, J.J., concur.