[No. 37788. Department One. April 21, 1966.]

WELLS B. McCURDY, *Respondent*, v. UNION PACIFIC RAILROAD COMPANY *et al., Appellants,* CHICAGO, MILWAUKEE, ST. PAUL & PACIFIC RAILROAD COMPANY *et al., Defendants.**

*Reported in 413 P.2d 617.

*Skeel, McKelvy, Henke, Evenson & Uhlmann,* by *Frederick V. Betts* and *James M. Lindsey, Jr., Dean H. Eastman* and *Robert J. Allerdice,* for appellants.

*Hullin, Ehrlichman, Carroll & Roberts,* for respondent.

COCHRAN, J.†—In November of 1959, respondent read a newspaper article about a private railroad car named the "Spokane." Respondent was interested in the car for his own business and pleasure and, as a result, telephoned Otto Gray in Portland, Oregon, the then owner of the "Spokane," to inquire about its purchase. Mr. Gray offered to sell the car for $2,500, and respondent immediately accepted the offer, sight unseen. This was within 2 months after Gray had made his purchase. This car, which had been originally built in 1909, had a living room, dining room, bedrooms and baths. The car had been rebuilt in 1927 and a new heating system was installed. In 1957, it had been refurbished.

The car had been purchased by Gray from the Spokane International Railroad, an almost wholly owned subsidiary of Union Pacific Railroad Company. In addition, Mr. Gray is the brother of Omar Gray, claims agent for the Union Pacific.

A Mr. Wallen, master mechanic of the Spokane International, had kept the car in condition for immediate use at all times. However, in 1954, in attempting to repair the independent auxiliary hot water heating plant, he found the circulating pipes so corroded that the heater was no longer used. The primary heating source for the car was a steam vapor circulating system, the steam being obtained from a locomotive or a stationary source. Mr. Wallen became concerned about this system as well and, as a result, would not permit more than 5 pounds of steam to be introduced into the car. This was accomplished by means of a reducing valve set for 5 pounds maximum pressure and attached to the station steam line leading to the car.

When respondent purchased the car, it was in Spokane, Washington, where it had been stored indoors except for the last 2 years. Respondent had no notice of the condition of the steam pipes. Mr. Wallen became an employee of the Union Pacific in 1959, when Union Pacific acquired the Spokane International and, with it, the car "Spokane." It

†Judge Cochran is serving as a judge pro tempore of the Supreme Court pursuant to Art. 4, § 2(a) (amendment 38), state constitution.

was the Union Pacific which offered the car for sale at the time it was purchased by Gray. However, Mr. Wallen's department made a survey report indicating that the car was unfit for service.

After respondent purchased the "Spokane," he made arrangements to have the car moved from Spokane, Washington, to Seattle, and for that purpose he went to Spokane on January 2, 1960. Respondent had the car inspected by the Great Northern Railway Company prior to bringing it to Seattle. This report noted no defects in the steam heating system or in any other system inspected.

The car was moved from Spokane to Seattle by the Great Northern and was later taken to Tacoma and placed at the Milwaukee Railroad train yards and was kept locked while there. There were three keys to the "Spokane," one of which was in the possession of the Milwaukee.

In early March, 1960, respondent asked the Union Pacific to bring some school children to Seattle in the car on March 10th. No other instructions were given by respondent. The Milwaukee was informed and that railroad moved the car to an interchange track where Union Pacific-Northern Pacific joint employees picked it up the afternoon of March 9th. Leonard Jacobsen, a joint employee, went to the "Spokane" at about 4:20 p.m. of that day for the purpose of putting it on steam. There was no reduction valve and the pressure on the line was about 60 pounds and the steam was 260 degrees Fahrenheit. After turning on the steam, Jacobsen looked in a window from the observation platform and walked around the car and left the area. Returning about 8 p.m. to service a passenger train, he noticed steam escaping from a kitchen vent. After servicing the passenger train, Jacobsen got a Mr. Cossins, a special agent, to accompany him to look at the car. Looking into the car, they saw that steam was escaping into it, but no damage was then apparent. They tried the door but, it being locked, and they having no key, could not open it. At that time the doorknob was cold. The escaping steam was reported to a Mr. Ackley, who was in charge of operations that night,

and who directed Jacobsen to turn off the incoming steam, which was done at about 8:30 p.m. Ackley said he would see if he could locate a key. Nothing else was done to ventilate the car.

The Union Pacific called and left a message for respondent at his home, and when he arrived home at about 11 p.m., he called the Union Pacific and was told to come to Tacoma with a key to the car because of some unspecified problem. When he arrived at the car some time between 12:30 and 1 a.m., the car was still closed up and steam was still escaping. The doorknob was so hot it could hardly be touched.

The steam had entered the interior of the car because of a broken steam pipe in the car, located in such a position that it could not be seen by a person walking through the car. Serious damage to the car resulted.

The jury returned a verdict in favor of the respondent in the sum of $56,000 against the appellants, Union Pacific Railroad Company and Northern Pacific Railway Company, and dismissed the Chicago, Milwaukee, St. Paul and Pacific Railroad Company.

The appellants make the following assignments of error:

1. Error in refusing to grant defendants' motion for a directed verdict at the close of plaintiff's case, and again in failing to grant defendants' motion for a directed verdict at the close of all the evidence.

2. Error in denying defendants' post trial motion for judgment notwithstanding the verdict of the jury.

3. Error in denying defendants' motion for a new trial on all issues because the court—

(a) Failed to allow the defendants to have their theory of the case presented to the jury by proper instructions;

(b) Failing to instruct that a carrier is not liable for damages arising from latent defects within a railroad car owned and furnished by the shipper (respondent);

(c) Failing to instruct that a carrier owes only the duty of exercising ordinary care in inspecting a railway car owned and furnished by the shipper;

(d) Failing to instruct that the owner of a railroad car must exercise reasonable care in inspecting for defects and he impliedly warrants its fitness to the common carrier to whom it is delivered for transportation.

4. Error in giving the court's instruction No. 14 relating to damages.

■ Assignments of error Nos. 1 and 2 may be disposed of by saying that our examination of the evidence in the record, in the favorable light required (*Gregory v. Shannon,* 59 Wn.2d 201, 367 P.2d 152; *Boyd v. Edmonds,* 64 Wn.2d 94, 390 P.2d 706) satisfied us that the trial court did not err. Upon the evidence presented, the minds of reasonable men could well differ upon the issue of whether or not appellants were guilty of negligence in one or more of the manners alleged.

Assignment of error 3(a): It is the opinion of the court that appellants had the opportunity to and did present their theory of the case to the jury. The theory of both parties on the question of liability was grounded upon the duty of the railroads and the duty of the owner.

■ The duty of a common carrier toward the property of others being transported is summarized in 13 C.J.S. *Carriers* § 40 at 84, as the duty to exercise such care as is required to protect that property from loss or injury during the transportation. As stated in *Conger v. Cordes Towing Serv., Inc.,* 58 Wn.2d 876, 878, 365 P.2d 20: "A common carrier is charged with the highest degree of care consistent with the trade, in both the maintenance and operation of its vehicles."

In a correct instruction on the law, the court, in instruction No. 6, said to the jury:

Ordinarily "negligence" is defined as a failure to exercise reasonable and ordinary care such as an ordinarily careful and prudent person would use under the same circumstances, but in this case the defendants owed plaintiff a greater degree of care. A railroad which carries or moves the property of the public is a common carrier. While not an insurer of the safety of such property, the carrier owes the owner of the property the highest degree

of care for the safety of such property from loss or injury during the transportation which is consistent with the practical operation of the railroad.

The car was in transit at the time of the damage. The car was in the course of one movement from the Milwaukee yards in Tacoma to the Union Station in Seattle. The way-stop at the Tacoma station was incidental to that journey.

It will be noted that the court used the words "consistent with the practical operation of the railroad." Thus any contention that the appellants could or could not do more than they did and still be able to properly perform the business of operating a railroad was before the jury.

In other instructions, the court instructed the jury on "proximate cause" so that the jury knew that any negligence of the appellants would have to be shown to have proximately caused the resulting damage.

The conduct of appellants through their employees, both before and after the break in the steam pipe, was in issue.

Appellants' assignments of error 3(b), (c) and (d) will be considered together.

Appellants requested an instruction which reads as follows:

> If the defect in the steam pipe in the plaintiff's car was a latent defect—that is, one which could not be discovered by the exercise of ordinary and reasonable care, then the defendants would not be negligent in admitting steam into the heating system.

This is not a correct statement of the law under the facts in this case. It ignores the fact that the evidence is undisputed that the appellants knew of the defect and that thus it was not latent as to them. It is also defective in that it does not take into consideration those defects which were discoverable in the exercise of the highest duty of care commensurate with the practical operation of the railroad. The instruction also ignores the question of care in the manner of introducing steam into the car, and the carrier's duty of care after discovery of the escaping steam. There were no requested instructions that covered these points.

The evidence is clearly against the position taken by appellants as to latent defects in that there is no evidence that respondent knew of any latent defect in the car or had any opportunity to know, and that on the contrary, appellants did know of the condition of the steam pipes. Further, respondent had already moved the car after its purchase from Spokane to Seattle with no difficulty, indicating clearly that it was fit for transportation. As has been already pointed out, the carrier has the duty of exercising the highest degree of care to discover defects, not just ordinary care.

Further, it is not enough for the carrier to demonstrate that the hazard to the property was caused by a latent defect. The carrier's contributing, concurring, subsequent or superseding neglect is sufficient to make it liable notwithstanding proof of a latent defect, act of God or one of the other limited number of excepted causes which may relieve a carrier of liability to an owner.

The general rule is summarized at 13 C.J.S. *Carriers* § 80, p. 159:

[I]t is very generally declared that, if the negligence of the carrier concurs with the excepted cause in producing a loss or injury, the carrier is not exempted from liability by showing that the immediate cause was the act of God, or some other excepted cause. As otherwise expressed, the carrier is responsible where the loss is caused by an act of God or other excepted cause, if the carrier's negligence mingles with it as an active and cooperative cause.

In 9 Am. Jur. *Carriers* § 731, at 867, the same rule is recognized:

If negligence on the part of the carrier proximately contributes to the loss or injury, the fact that the goods were defectively packed or prepared, or improperly loaded, is not available as a defense, even though it may have been a contributing factor.

This court has recognized this carrier's burden of proof of continuing freedom from negligence in *Western Mach. Exch. v. Northern Pac. Ry.*, 142 Wash. 675, 254 Pac. 248, where the railroad failed to prove itself free of any negli-

gence in its attempt to show a crane was damaged due to defective preparation for shipment.

In *Railway Express Agency v. Schoen,* 70 Ariz. 87, 90, 216 P.2d 420, the rule is stated as follows:

> "The defendant cannot escape the consequences of its negligence because the flood was an act of God. It is a well-settled principle that, if the defendant's negligence commingled with and operated as a contributive element proximate to the injury, it is liable even though such injury was due to an act of God. In order for the defendant to escape liability under the exemption afforded by law, the act of God *must be the sole* and only cause of the injury, and this, too, unmixed with the negligence of the defendant, for if the defendant's negligence commingled with it in the loss as an active and co-operative element, and the loss is proximate thereto, or, in other words, is a reasonable consequence of the negligent act, it is regarded in law as the act of the defendant rather than as the act of God. * * * "

To the same effect are *Merchants' Transfer Co. v. Kiser,* 179 Ky. 324, 200 S.W. 454; *Porter Screen Mfg. Co. v. Central Vermont Ry.,* 92 Vt. 1, 102 Atl. 44.

The court properly refused the requested instructions of the appellants as they were not proper statements of the law under the facts of this case.

Assignment of error No. 4 is to the giving of instruction No. 14, relating to damages. This instruction is as follows:

> It is the duty of the Court to instruct you as to the measure of damages in case you find a verdict for the plaintiff. By the giving of this instruction, the Court does not mean to suggest to you what your verdict should be or for which party it should be rendered.
>
> If your verdict is in favor of the plaintiff, you should allow such sum as will fairly and justly compensate plaintiff for any loss sustained and will restore plaintiff as nearly as possible to his position had the damage in question not been sustained.
>
> In assessing the amount of damages to the railroad car, you may consider all relevant evidence. You may take into account evidence as to the cost of restoring the car to its former condition. The total award for damages to the car itself may not exceed the difference between the

actual or intrinsic value of the car or its value to the owner immediately prior to its being damaged and its salvage value immediately afterwards. This does not include sentimental value, if any. In determining this actual or intrinsic value or value to the owner, you may consider all of the relevant evidence, and are not bound by any particular item of evidence.

In addition, you may allow damages for the loss of use, if any, which you find established by the evidence. In measuring such damages, you may take into account any lost rental value and the reasonable value of any business or personal use to the owner which you find established by the evidence for a period of time following the damage which is reasonably necessary under all of the evidence for repair or replacement of this type of property under all of the existing circumstances as they reasonably appeared to the owner of the damaged property.

This is the only instruction given on damages.

Appellants' theory on damages at the trial was based upon this principle:

Ordinarily the measure of damages for the loss or destruction of personal property is its market value, if it has a market value, and in such case no recovery can be had on the basis of its value to the owner individually, apart from its market value. 15 Am. Jur. *Damages* § 122, at 530.

An instruction embodying this principle was offered by the appellants but was refused by the trial court. Appellants also objected because the court's instruction did not cover their theory of mitigation of damages. Appellants excepted to the court instructing as it did because it allowed the jury to consider the loss of use as an element of damages.

The question raised on mitigation of damages can be disposed of by referring to the case of *Burr v. Clark,* 30 Wn.2d 149, 159, 190 P.2d 769, where the court said:

Appellants introduced no evidence to show that it was possible for respondents to mitigate the damages in any way. It is well-settled law in this and other jurisdictions that the burden of proving mitigation of damages rests with the party whose wrongful act caused the damages. In *Norm Advertising, Inc. v. Monroe Street Lbr. Co.,* 25

Wn. (2d) 391, 171 P. (2d) 177, we set forth the rule by quotation from 134 A.L.R. 243, as follows:

" 'The overwhelming weight of authority is to the effect that in actions for damages arising out of either breach of contract or tort the burden is upon the party whose wrongful act caused the damages complained of to prove anything in diminution of the damages, or, in other words, that the damages were lessened or might have been lessened by reasonable diligence on the part of the aggrieved party.' "

In the absence of such proof by the appellants, we will not consider the question of mitigation of damages.

■ Since there was no evidence presented or offered that respondent should or could have mitigated damages, the trial court properly refused to instruct on the subject.

■ The primary principles to be applied in awarding damages for negligent injuries to property is that the owner shall have actual monetary compensation for the loss sustained. If the property is a total loss the measure of damages is the value of the property destroyed or damaged. This is its market value, if it has a market value. If the property is damaged but not destroyed, the measure of damages is the difference between the market value of the property before the injury and its market value after the injury. (Again, if it has a market value.) If the property does not have a market value, then if a total loss, the measure of damages is the cost to replace or reproduce the article. If it cannot be reproduced or replaced, then its value to the owner may be considered in fixing damages.

■ The term "market value" as that term is used, means that reasonable sum of money which the property would bring on a fair sale, by a man willing to sell, but not obliged to sell, to a man willing to buy, but not obliged to buy.

In order for it to be said that a thing has a market value, it is necessary that there shall be a market for such commodity—that is, a demand therefor and an ability from such demand to sell the same when a sale thereof is desired. 15 Am. Jur. *Damages* § 122, at 531.

No market value is generally attributable to such things as family photographs, writings, antiques, clothing, paintings, plans of architects, engineers, etc., and in some cases machinery used for a specific purpose.

Evidence from which a conclusion could be reached that a market price existed or could be established can be found in the testimony of respondent himself. He testified as follows:

> Q. Have you attempted to determine whether any were available for purchase? A. I have. Q. Are any available for purchase, or were they in the years 1960 through 1964? . . . A. Yes. Q. And who had such a car? A. There were several that I determined. The Santa Fe Railroad had one which they sold. The West India Fruit & Steamship Company had one which they sold. And Lucius Beebe had one that he said he would sell and then withdrew it from the market. Q. Who is Lucius Beebe? A. He is probably known as the Dean of private car fanciers, I guess you could call him. . . . Q. (By Mr. Ehrlichman) Do you know of cars of comparable age and facility which have been sold during these four years, 1960 through 1964? A. Yes. Q. Can you say whether or not there is in fact a market in these cars in the United States? Do you know what I mean by "a market?" A. No. Q. Can you say whether or not — A. I mean, I don't know what you mean by "market." Q. I am going to try and explain it. Can you say whether or not there is a going price for cars of this kind in the United States during this period of time that we have been talking about? [Appellants objected to this line of testimony. The trial court overruled the objection with the following statement:] THE COURT: This question doesn't necessarily relate back to prior questions. It asks an owner whether or not there is a going price on a commodity he owns. Objection overruled. A. Yes. Q. Can you say what in your opinion the value of your car was on the 9th of March, 1960, before it was damaged? A. My appraisal? Q. Your own opinion, yes. A. $20,000 to $22,000.

■ Of course, the owner of a chattel may testify as to its market value without being qualified as an expert in this regard. *Wicklund v. Allraum*, 122 Wash. 546, 211 Pac.

760; *Ingersol v. Seattle-First Nat'l Bank,* 63 Wn.2d 354, 387 P.2d 538.

In addition, there was other evidence on the market value of respondent's car: the original purchase of the car for $550 from the Spokane International Railroad; the offer to sell the car for $700 which Mr. Wallen rejected; and the subsequent purchase by respondent for $2,500; all of which occurred within 6 months of the loss. Other evidence as to the condition of the car tended to show that it could not have been sold for more than $2,500.

The respondent's testimony, the evidence on negotiations for purchase of the car, the evidence on the condition of the car, convince us that appellants' theory on market value should have been presented to the jury. The court's failure to do so amounted to a finding by the court that there was no market value on disputed facts, thus usurping the province of the jury. If the jury, having been instructed on market value, nevertheless finds that there was no market value, then its actual or intrinsic value, including consideration of its value to the owner, may be used by the jury in fixing damages. *Covey v. Western Tank Lines, Inc.,* 36 Wn.2d 381, 218 P.2d 322; *Palin v. General Constr. Co.,* 47 Wn.2d 246, 287 P.2d 325.

There was also evidence in the case from which the jury could find that the car was totally destroyed for all practical purposes, and evidence as to cost of repairs if it were repaired; thus adding additional factors for the jury to consider.

■ If the jury should find that the car was totally destroyed, then respondent cannot recover for the loss of use, as the measure of damage in such a case is the value of the property destroyed. *Adams v. Bell Motors, Inc.,* 9 La. App. 441, 121 So. 345; *Helin v. Egger,* 121 Neb. 727, 238 N.W. 364; *Skinner v. Scott,* 238 La. 868, 116 So.2d 696. The reason for this rule is that in the recovery of the full value of the vehicle, as of the date of its destruction, the owner has been made whole. 169 A.L.R. 1067.

If the jury should find that the car could reasonably be repaired, then the owner may recover compensation for the loss of use of the car while the repairs are in progress.

The period for which recovery may be had for the loss of use or rental value of a motor vehicle is generally held to be that which is reasonably required for the making of repairs or that within which the vehicle could be repaired with ordinary diligence. . . . The reasonableness of the time consumed in making the repairs is a matter dependent largely upon the circumstances of the case . . . . 8 Am. Jur. 2d *Automobiles and Highway Traffic* § 1048, at 609.

This rule was recognized by our court in the case of *Holmes v. Raffo*, 60 Wn.2d 421, 429, 374 P.2d 536, where the court said:

The rule with respect to loss of use of an automobile is that the owner may recover, as general damages, the use value of which he is deprived because of the defendant's wrongful act. *Stubbs v. Molberget*, 108 Wash. 89, 182 Pac. 936, 6 A.L.R. 318 (1919); *Jellum v. Grays Harbor Fuel Co.*, 160 Wash. 585, 295 Pac. 939 (1931); *Norris v. Hadfield, supra* [124 Wash. 198, 213 Pac. 934, 216 Pac. 846 (1923)]; *Western Mach. Exch. v. Northern Pac. R. Co.*, 142 Wash. 675, 254 Pac. 248 (1927). Damages to compensate for this loss may only take into account the reasonable time in which the automobile should have been repaired. 5 Berry, Law of Automobiles § 5.233 (1935); *Madden v. Nippon Auto Co.*, 119 Wash. 618, 206 Pac. 569 (1922).

The trial court erred, however, in its instruction No. 14 when it instructed the jury to consider reasonableness of time as it appeared to the owner. The reasonableness of the time for which loss of use is to be compensated is as it would appear to an ordinary prudent man under all the circumstances.

This precise point was passed on in the case of *Sage v. Northern Pac. Ry.*, 62 Wn.2d 6, 380 P.2d 856, where, in its opinion, the court sets forth a portion of a jury instruction as follows, p. 10, n.2:

"The defendant Liggett's conduct in that regard is not necessarily to be judged by the facts as they now appear

to you but *he is entitled to have his acts and conduct considered in the light of the facts as they appeared to him at the time, and if you find that the defendant Liggett with his view of all the circumstances as they were at that time exercised ordinary care,* then the defendants Liggett and Time Oil Company are not guilty of negligence and your verdict should be for those defendants." (Italics ours.)

The court held that this was prejudicial error. It said, at p. 11:

The jury, by the italicized portion of the instruction, is told its verdict should be for Time Oil and Liggett if Liggett exercised ordinary care in the light of the circumstances as they appeared to *him,* as opposed to circumstances as the jury, from all the evidence, found them to be, or as they would have appeared to an ordinary prudent man. This is error.

■ The trial court's instruction No. 14 commits the same error. Since the trial court did not properly instruct on the issues to be considered by the jury in fixing damages, the case is remanded for a new trial on the issue of damages only, with the jury to be instructed in accordance with the views expressed in this opinion.

[C]ourts have the authority to limit issues on a new trial in those cases where it clearly appears that the original issues were distinct and separate from each other and that justice does not require the resubmission of the whole case to the jury. *Nelson v. Fairfield,* 40 Wn.2d 496, 501, 244 P.2d 244 and *Sage v. Northern Pac. R. Co., supra* at 16.

This case falls in that category.

ROSELLINI, C. J., HUNTER and HALE, JJ., concur.

OTT, J. (concurring in part and dissenting in part)—I concur with the majority that appellants should be granted a new trial, limited solely to the issue of damages.

I do not agree with the majority that the respondent is entitled to have the jury consider the cost of repair of the railroad car and its loss of use as elements of damages, for two reasons:

(1) It was shown that the cost of repair, in the sum of $36,226.40, was almost 15 times more than the full value of the car 6 months before the accident. The rule is that the cost of repair and loss of use are proper elements of damages only where the property is reasonably susceptible of repair. McCormick, Damages § 124 (1935). It cannot be said that this car is *reasonably susceptible of repair* at a cost of $36,226.40, when its value 6 months before the accident was shown as not to exceed $2,500, and no sum whatever was expended in the interim to enhance its value.

Under similar circumstances, we held, in *West Coast Transport Co. v. Landin,* 187 Wash. 556, 60 P.2d 704 (1936), that, where the value of a truck was $5,700 before the accident and only $500 after the accident, it had been destroyed.

Applying this rule in the instant case, where the cost of repair is approximately 15 times the value of the property damaged, it must be considered to be destroyed.

(2) The majority hold that the term "market value" means that reasonable sum of money which the property would bring on a fair sale by a man willing to sell, but not obligated to sell, to a man willing to buy, but not obligated to buy. I agree with this definition of market value. Before the Spokane International Railway Company offered the car for sale on the open market, it had inspected this car, which was manufactured in 1909, and found that it would cost approximately $36,000 to repair it for use as railroad rolling stock. The car was then offered for sale on the open market in an "as is" condition.

Six months before the accident, this car was sold by a person willing to sell to a person willing to buy for the sum of $550. Thereafter, the car was offered for sale a second time in its same "as is" condition and sold for $2,500. Applying the willing seller and purchaser test, the car then had a market value of $2,500.

In my opinion, the evidence established that the car in question, in its state of disrepair at the time of the accident, had an "as is" market value, and the respondent is entitled

to receive as damages only the full market value of the car on the date of its destruction.

Upon retrial, the jury should be instructed that the measure of damages to which the respondent is entitled is limited to that fair market value which the evidence establishes the car had on the date it was destroyed.

August 31, 1966. Petition for rehearing denied.