**UNITED STATES of America,**
**Plaintiff,**

v.

**GULF, MOBILE AND OHIO RAILROAD**
**COMPANY and Wade Tung Oil Com-**
**pany, Inc., Defendants.**

**Civ. A. No. 13429.**

United States District Court
E. D. Louisiana,
New Orleans Division.

July 29, 1966.

Louis C. LaCour, U. S. Atty., Kathleen Ruddell, Asst. U. S. Atty., Ernest N. Morial, Asst. U. S. Atty., Eastern District of Louisiana, New Orleans, La., for plaintiff.

Curtis, Foster & Dillon, Gerard M. Dillon, New Orleans, La., for Gulf, Mobile & Ohio R. Co.

Watts & Watts, France W. Watts, Jr., Franklinton, La., for Wade Tung Oil Co., Inc.

AINSWORTH, District Judge:

This action was brought by the United States of America on behalf of Commodity Credit Corporation,[1] against Gulf, Mobile and Ohio Railroad Company and Wade Tung Oil Company, Inc., to recover damages of $12,942.37 for the loss of part of a tank car shipment of tung oil occasioned by leakage while in possession of the railroad. The Court's jurisdiction is properly invoked under 28 U.S.C.A. § 1345 [2] which relates to suits by the United States.

Commodity Credit Corporation is an agency of the United States. Gulf, Mobile and Ohio Railroad Company is a corporation organized under the laws of the State of Mississippi with a line of railroad within the Eastern District of Louisiana. Wade Tung Oil Company, Inc., is a corporation organized under the laws of the State of Louisiana with a place of business in Bogalusa Louisiana. On October 24, 1960, Commodity Credit Corporation and Wade Tung Oil Company, Inc. entered into an agreement under which Wade Tung Oil Company, Inc., was to store tung oil for Commodity Credit Corporation and, on directions from Commodity Credit Corporation, to deliver the oil to it f. o. b. tank car at the shipping point designated on the company's application for approval in accordance with the delivery authorization issued by Commodity Credit Corporation. On December 17, 1960, pursuant to their agreement, Wade loaded 79,180 pounds of tung oil into Car No. CHAX 135, which car was owned by Chartrand's Tank Car Service, Inc., a California corporation, and leased by it to Commodity Credit Corporation. An employee of Wade Tung Oil Company, Inc., James L. Harris, inspected the interior of the car

---

1. See 15 U.S.C.A. 714b(c).

2. This section reads: "Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress. June 25, 1948, c. 646, 62 Stat. 933."

immediately prior to loading and found no visible defects. After loading, he inspected the exterior of the car and found no leakage. Car No. CHAX 135 had moved tung oil from Wade Tung Oil Company's plant at Bogalusa to Commodity Credit Corporation, c/o Hess Terminal Corporation, Marrero, Louisiana, on November 16 and 24 and December 3 and 9, 1960, without incident. Gulf, Mobile and Ohio Railroad Company picked up the car on December 17, 1960, between 4:00 and 4:30 p. m., on the premises of Wade Tung Oil Company, Inc. in Bogalusa, Louisiana, and issued its bill of lading for one 10,000-gallon tank car of domestic tung oil for storage; the railroad company then moved the car to its South Yard, a distance of approximately 1½ miles. Between 4:30 and 5:00 p. m. the car was moved into and out of the team track and then onto the main line of GM&O in the South Yard. During this period of time, between 4:30 and 5:00 p. m., the exterior of the car, while on the main track of the South Yard of GM&O, was inspected by Mason Fornea, car inspector for GM&O, and no defects were noted. About 7:00 p. m. the car was moved from the main line to the scale track in the yard. About 10:45 p. m. the car was moved back from the scale track onto the main line, then into and out of the repair track, and finally onto Track No. 6 in the South Yard. At about 10:55 p. m., while the car was in possession of GM&O, leakage of tung oil from the tank car was discovered by two railroad employees. A verbal report of the leakage was promptly made by them to the crew of the yard engine. Thereafter, GM&O promptly notified Wade Tung Oil Company, Inc. of the leakage and immediately returned the car to the tung oil company's plant, which promptly undertook to pump the remaining contents of Car No. CHAX 135 into another tank car. Oil was still leaking from the car during the course of the pumping operation. After the discovery by the railroad company of the leakage, there was nothing it could do to prevent further leakage and it undertook to do the only thing possible to diminish the extent of the loss of oil from the car when it returned the car to Wade Tung Oil Company, Inc., which pumped the remaining oil from the car thereby recovering 19,400 pounds of the oil. On that date, December 17, 1960, the value of 59,780 pounds of tung oil was $12,942.37. Commodity Credit Corporation filed a claim against Gulf, Mobile and Ohio Railroad Company for the loss. GM&O denied liability on the grounds that the loss was not due to any negligent handling of the railroad, but from the defective condition of Car No. CHAX 135, which defect was latent and not discoverable by reasonable inspection. Wade Tung Oil Company, Inc. has denied liability on the grounds that the loss was not due to any negligence on its part but was caused by defective condition of the car, which condition was latent and not discoverable by a reasonable inspection, or that the loss was due to the negligent handling on the part of Gulf, Mobile and Ohio Railroad Company.[3]

Car No. CHAX 135 is the type of tank car ordinarily used for the transportation of tung oil and similar liquids. The cylindrical tank of the car is formed by an upper metal shell ⅜ of an inch thick an a lower metal shell ⅝ of an inch thick, joined together on both sides of the car by double rows of rivets, with the lower sheet overlapping the upper sheet. The break in the tank occurred in the upper shell slightly above the top row of rivets in a portion thereof which had been covered by the overlap of the lower sheet. The break was ⅜ of an inch thick and approximately 3½ feet long. Prior to the loading of the car on the morning of December 17, 1960, James L. Harris, mill foreman of Wade Tung Oil Company, Inc., carefully inspected the interior of the car, checking the rivet line carefully with a light. He found no structural or other defects and concluded that the car was fit for loading and

---

3. All of the pertinent facts contained in this paragraph were agreed to by the written stipulation of the parties filed with this Court on January 14, 1966.

transporting oil. Harris then supervised the loading of the car and thereafter inspected the exterior of the car and found no defects or leakage.

An inspection was made later by Mason Fornea, car inspector for GM&O, of the exterior of the loaded car while it was in the South Yard of GM&O. He found no defects, structural or otherwise, and no leakage. Prior to the rupture of the tank car it was impossible for the railroad to inspect the interior. An additional check was later made by the yard clerk for GM&O at 10:45 p. m. when the car was weighed, and no defects or leaks were noted. Shortly afterwards, or some time between 10:45 and 10:55 p. m., car CHAX 135 was "kicked" onto Track No. 6 in the railroad yard and coupled to another car on that track. It was during this coupling operation that part of one side of the car split open along the riveted seam, causing the tung oil to escape.

■ The evidence indicates no liability on the part of defendant, Wade Tung Oil Company, Inc., and we so find. Wade did not own or select Car No. CHAX 135, which had been sent to it by Chartrand at the Government's request, for loading. There was a complete absence of evidence which would tend to show any negligence by Wade. Prior and subsequent to the loading operation, Wade's employee, Harris, inspected the car and found no defects or leakage. The car was moved from Wade's premises by GM&O and it was not until approximately five and a half hours later, when the car was under the control of GM&O, that the leakage occurred.

■ The only remaining issue is whether GM&O is liable to the Government for the loss of the oil. GM&O is a common carrier railroad operating in interstate commerce. The common-law rule with respect to a common carrier's liability for damage to goods transported by it has been codified by the Carmack Amendment to Section 20(11) of the Interstate Commerce Act of 1887,[4] thereby "making a carrier liable, without proof of negligence, for all damage to the goods transported by it, unless it affirmatively shows that the damage was occasioned by the shipper, acts of God, the public enemy, public authority, or the inherent vice or nature of the commodity." Secretary of Agriculture v. United States, 350 U.S. 162, 76 S.Ct. 244, 100 L.Ed. 173 (1956).

■ Plaintiff has shown delivery of its cargo to the carrier in good condition, the subsequent damage and loss in transit, and the amount of damages occasioned by the loss. Applying federal law to these circumstances, plaintiff has established a prima facie case. "Thereupon, the burden of proof is upon the carrier to show both that it was free from negligence and that the damage to the cargo was due to one of the excepted causes relieving the carrier of liability." Missouri Pacific R. Co. v. Elmore & Stahl, 377 U.S. 134, 84 S.Ct. 1142, 12 L.Ed.2d 194 (1964).[5]

■ Defendant GM&O, offered evidence to prove that the actual loss of the tung oil was due to one of the so-called excepted causes; that is, that the break in the tank which caused the leakage was occasioned by the act or default of the shipper in furnishing a defective car. The defendant railroad offered evidence that an inspection of the car after the occurrence showed that the breakage in the top sheet of metal occurred in the area of, and was caused by, an old progressive break which extended from the outside of the sheet toward the inside thereof; that at the time of the final break, the thickness of the upper sheet of metal at the point of failure had been reduced from $\frac{3}{8}$ of an inch to $\frac{1}{16}$ of an inch of good metal, which ultimately split during normal usage of the car. This theory was based on the opinion of the railroad's witness, G. D. Brown, who made an inspection of the tank car eleven days after the loss of the tung oil. Mr. Brown is an

---

4. 49 U.S.C.A. § 20(11).

5. See also Super Service Motor Freight Co. v. United States, 6 Cir., 1965, 350 F.2d 541; L. E. Whitlock Truck Service, Inc. v. Regal Drilling Company, 10 Cir. 1964, 333 F.2d 488.

employee of GM&O with the title of mechanical engineer. Though he attended Georgia Tech night school, he is not a graduate engineer nor is he a metallurgist. On December 28, 1960, eleven days after incident sued on, he inspected the tank car both internally and externally at Bogalusa and said he could plainly see the longitudinal broken seam; that there was a ragged break through the thickness of the metal. He thought the break was a spontaneous one; that there was no evidence of prior leakage and it was impossible to discover the alleged defect in the metal either externally or internally before the leak occurred. Internal inspection was made by going into the inside of the tank car with lights and checking the grain and ragged edges of the metal. He said that there was a hairline about 1/16 of an inch thick irregularly toward the inside diameter which he claimed was obviously a new break because the metal was shiny. He conceded that the damage to the car occurred while it was in possession of the railroad in the railroad's yard and said he believed it was caused by defective metal and that the 1/16-inch irregular break was a new shiny break whereas the so-called old break which could be seen on external examination only was brown and discolored. He said the old break did not go all the way through the metal, but only partially. He said that the final failure of the metal was caused by its deterioration; that the metal already had a fracture in it but it was not final or complete until the last minute. He admitted that the only testing he did was by visual inspection. He did not measure the so-called old break but just took an average as to his opinion of the thickness. His testimony does not convince us that the leakage occurred through a defective car.

Mr. Brown is not a graduate engineer nor is he a metallurgist. Under the circumstances, the discoloration in that part of the metal which he termed an old break and which could be seen only from external examination might well have resulted from water, oxidation or the effects of the spillage of the tung oil itself which is a tacky or sticky material. He did not examine the car until eleven days after the accident and the car, of course, was meanwhile exposed to the elements and to the discoloring effects of leakage of the oil. While it is true that he has had considerable experience as a railroad employee, we were left with the impression that he expressed opinions as to condition of the metal in the car which were not justified by his qualifications. In any event, he conceded that the final fracture and ensuing spillage occurred while the tank car was in the possession of the railroad. We are of the definite conviction that the railroad has failed to show by a preponderance of convincing proof as its legal burden required it to do, that it did not negligently cause the fracture which resulted in the loss of oil.

■ While there was no direct evidence of any specific act of negligence of GM&O, such as an accident or excessive speed in handling the car, the burden of proof is nevertheless upon the carrier to show that it was free from negligence. Missouri Pacific R. Co. v. Elmore & Stahl, supra. The evidence shows that the break which caused the leak occurred at approximately 10:45 p. m. or shortly thereafter, during the switching and coupling operations of GM&O in connection with the tank car.[6] These operations in

6. There is no dispute between the Government and GM&O as to the time and place of the break which immediately preceded the leakage. According to the stipulation to which we have already referred, at "About 10:45 P.M. [the car was] moved from scale track onto main line then into and out of repair track and finally on to track 6 in South Yard. At about 10:55 P.M. leakage was discovered. * * *" GM&O in its pro-

posed "Findings of Fact" states: "At about 10:45 o'clock P.M. the said tank car was switched from the said scale track to Track No. 6 in the said South Yard, and during the course of this movement, while the said tank car was being coupled to another car on that track, one side of the said tank car suddenly split open along a longitudinal riveted seam, permitting the tung oil to escape."

railroad yard vernacular are described as "kicking" operations. Defendant, GM&O, introduced evidence to show that there was nothing unusual about these operations and that they were conducted with due care. However, the testimony of the railroad's witnesses, negative in effect, did not convince the Court of GM&O's freedom from negligence. The switchman, Collins, conceded the possibility that the break could have occurred from the jolting effect of coupling when the car was "kicked" down the track.

Thus, by applying the recent decision of the United States Supreme Court in Missouri Pacific R. Co. v. Elmore & Stahl, supra, we find that GM&O is liable to the Government, as the railroad not only failed to prove that the loss was due to one of the common-law carrier exemptions, but also failed to exonerate itself from the presumption of its own negligence.

Defendant, GM&O, has attempted to distinguish the legal principles applicable, where, as here, the shipper (and not the carrier) procured and furnished the car. It contends that the rule of law to be applied is stated in 13 C.J.S. Carriers, § 50, page 98, to-wit:

"* * * where the shipper undertakes to furnish the cars used in transportation, it is generally held that the carrier is not liable for a loss resulting from their defective condition, especially if such condition could not have been discovered by the carrier by the exercise of due care." [7]

We agree with the quoted language. However, under this rule a carrier's relief from liability is predicated on satisfactory proof of the *existence of a defective car* and *loss occurring as a result thereof*. The rule is obviously not applicable to the facts of this case.

As we understand the rule quoted from 13 C.J.S. Carriers, page 98, supra, it is not a limitation or an exception to the common law, now codified in the federal law by statute. Furthermore, a review of the cases cited by GM&O,[8] brings us to the same conclusion. Relief by the carrier from liability under the rule as well as in the cited cases is contingent upon proof of one of the common-law defenses; that is, that the "loss was occasioned by the shipper" by furnishing a defective car, and additionally by proof that the loss was not caused by the carrier's negligence.

We find that the Government established a prima facie case of liability against the defendant carrier by showing delivery of the car and its contents in good condition, the subsequent damage and loss while the car was in the possession of the carrier and proof of the amount of damages; that the burden then shifted to the carrier to prove that the damage was due to one of the common-law excepted causes and that it was not guilty of negligence which caused the accident; that the carrier failed to exonerate itself by satisfactorily or convincingly bearing either of the burdens imposed upon it.

7. See also Annotation, 72 A.L.R. 885.

8. The Alabama Great Southern R. Co. v. Morris & Co., 5 CCA, 1918, 249 F. 312, the evidence showed that cottonseed oil leakage was caused by the use of an old car furnished by the shipper from which the metal had worn and to which a patch had been applied in an unworkmanlike manner, causing the body of the tank to crack at the edge of the patch, and the defect was known to the shipper but not to the defendant carrier. In Lever Bros. Co. v. Baltimore & O. R. Co., 4 CCA, 1947, 164 F.2d 738, the evidence showed that tallow was lost by leakage from a defective car furnished by the shipper. A piece of wood wedged in an outlet valve in the bottom of the car prevented the valve from closing. Nuts on the rod were out of adjustment and the valve handle and rod were stuck. The carrier showed that there was no negligence on its part. In Southern Cotton Oil Co. v. Atlantic Coast Line R. Co., E.D.Va., 1927, 17 F.2d 411, the Court denied recovery to a shipper where loss of oil occurred as a result of leakage of a car furnished by it and where due care had been exercised by the carrier to prevent the loss.

Accordingly, there will be judgment in favor of plaintiff, the United States of America, and against defendant, Gulf, Mobile and Ohio Railroad Company, in the sum of $12,942.37, and further in favor of defendant, Wade Tung Oil Company, Inc., dismissing the suit as to this defendant.