The STROH BREWERY COMPANY, an
Arizona Corporation, Plaintiff and
Counter-Defendant,

v.

GRAND TRUNK WESTERN RAILROAD
CO., a Michigan Corporation, Defendant and Counter-Plaintiff.

Civ. A. No. 78–72172.

United States District Court,
E. D. Michigan, S. D.

April 29, 1981.

Jere D. Johnston, Detroit, Mich., for plaintiff and counter-defendant.

John A. Ponitz, Detroit, Mich., for defendant and counter-plaintiff.

## MEMORANDUM OPINION

JULIAN ABELE COOK, Jr., District Judge.

This is an action for damages brought against a common carrier under the provisions of 49 U.S.C. § 20(11), which is often referred to as the Carmack Amendments. Plaintiff, The Stroh Brewery Company [Stroh], is an Arizona corporation which does business within the State of Michigan. Grand Trunk Western Railroad Company [Grand Trunk], is a Michigan corporation which does business within the State of Michigan.

On or about September 14, 1976, a carload of "Stroh Bulk Type Malt," which had been ordered by Stroh from the Rahr Malting Company in Shakopee, Minnesota, was placed in hopper car number CNW 172379 [Stroh Malt Car] and shipped by rail to Detroit. The malt was to be delivered to Stroh at Greater Northern Feed, Inc. [Great Northern] which, in addition to being a wholly owned subsidiary, was Stroh's agent for taking delivery of railroad cars.

On or about September 9, 1976, a carload of barley, which had been ordered by Rickel Malting Company, Inc. [Rickel] from Fleischmann Malting Company, in Minneapolis, Minnesota, was placed in hopper car number CNW 173379 (Rickel Barley Car) and shipped by rail to Rickel.

Both cars were transferred to the Grand Trunk line in Chicago. Thereafter, they were transported to Grand Runk's Farnsworth Siding in Detroit, Michigan, arriving on or about September 20, 1976. Farnsworth Siding has eight tracks upon which Grand Trunk stores railroad cars until delivery. The only "hopper cars" that were stored on the Farnsworth Siding were those cars which were scheduled for delivery to Stroh and Rickel.

Simultaneously with, or prior to, the arrival of the Stroh Malt Car and the Rickel Barley Car at Farnsworth Siding, Grand Trunk sent "Constructive Placement Notices" (which had been prepared from inbound billings) to Stroh and Rickel, informing them that their respective cars had arrived. (These inbound billings described the respective contents as "Bulk Stroh Type Malt" and "Bulk Barley."

During the morning of September 21, 1976, Stroh called William Abbey, the Yardmaster of the Farnsworth Yard and an employee of Grand Trunk, and, according to the usual practices of these two parties, requested delivery of eight cars (six hopper cars and two empty boxcars) in a specific order at Great Northern. The Stroh Malt Car was included in that list of cars. Abbey transcribed the car numbers on his

"Switch List" in the order, as requested by Stroh. In the afternoon of September 21st, a copy of the "Switch List" was given to the switch crew (Joseph Lippai, John Wrubel, a third unknown individual and an engineer). Instead of delivering the Stroh Malt Car at Great Northern as requested, the switch crew mistakenly placed the Rickel Barley Car upon the Great Northern Siding for use and consumption by Stroh.

Although Great Northern had expected delivery of the Stroh Malt Car, its employees did not notice that the Rickel Barley Car had been delivered in its place. On Wednesday, September 22, 1976, Parrinello, a Stroh employee, was instructed to unload all of the cars. Stroh's standard procedures for unloading cars at Great Northern were as follows:

> Covered hopper cars of malt or grits are placed on GNFI [Great Northern Feed, Inc.] rail siding for unloading into malt and grit storage bins. Before unloading procedure begins, material is inspected in each compartment of each car. Car numbers are checked to ensure each car is placed on siding in sequence for unloading. Records are kept such as a "Daily Loading & Unloading" track sheet which the employees fill out as they unload cars, recording the seal numbers, card number and bin number. One sample is taken from each compartment and labeled appropriately as to the car number, date unloaded, supplier, type of material and compartment number.

*Deposition Exhibit No. 6.*

At all times that are relevant hereto, Stroh had the correct car number on its business records. It had an opportunity to discover that (1) one of the cars bore the wrong car number and (2) the contents within the car was barley, not malt.

The content from the Rickel Barley Car was unloaded, transported to Stroh and placed into the brewing process where it was mixed with existing Rahr Malt, which resulted in the contamination of the Rahr Malt and the burning out of certain grinding engines due to the texture of the barley. All of the contaminated Rahr Malt

had to be removed from the bin by vacuum, and the grinding engines were replaced. On September 24, 1976, Stroh ultimately received the Stroh Malt Car. Stroh subsequently sold the contaminated malt-barley mixture as feed and paid Rickel for the value of the bulk barley.

At all times that are pertinent to this inquiry, including the time at which the contracts of carriage were executed, the Yardmaster and members of the switch crew who misdelivered the Rickel Barley Car to Stroh at Great Northern knew that (1) the only hopper cars that were stored in Farnsworth Yard were those which had been consigned to Stroh or Rickel, (2) the Rickel hopper cars contained only barley, (3) the Stroh hopper cars, which were scheduled for delivery at Great Northern, contained only malt or corn grits, (4) the only hopper cars at Great Northern which contained either malt or corn grits, were for use by Stroh, (5) Rahr, Ladisch, Shrot and Lauhoff were names of some of the manufacturers of the malt and corn grits, (6) all of the Stroh hopper cars had to be delivered in a specific order because of the different contents in the cars, (7) Great Northern had two unloading pits over which the hopper cars would be placed by Grand Trunk, (8) each car would be emptied into one of two pits and then, by means of a screw elevator, its contents would be placed in a separate above ground storage bin from which the malt or corn grits would be deposited in a truck for delivery to Stroh, (9) the malt and corn grits would be utilized in the process of brewing Stroh's beer, and (10) the malt and corn grits would be returned wet to Great Northern after the brewing process as a byproduct ("spent grain Mash") where it would then be dried, blown into Grand Trunk boxcars and shipped to a specific designation.

Plaintiff has two claims for breach of contract against Defendant. The first contract of carriage involved the shipment of the Stroh Malt Car and the wrongful delivery of the Rickel Barley Car. Damages sought for this breach are for those out of pocket costs (e. g., the cost of the Rahr malt

which was contaminated when mixed with the bulk barley; the cost of removing that mixture from brewing facility; the cost of the bulk barley delivered, less the amount received for the malt-barley mixture) which were allegedly caused by the misdelivery. Inasmuch as Stroh did receive the Stroh Malt Car, no claim has been made for the value of its contents.

The second breach of contract of carriage is based upon Defendant's alleged failure to deliver the Rickel Barley Car to Rickel.[1] Damages for both claims amount to $19,-198.99.

The damages sought for the breach of the Stroh contract of carriage are considered special or consequential damages and must be decided upon the ability of a "reasonable man" to foresee the damages. The principles involved regarding the issue of "foreseeability" are aptly summarized in *Marquette Cement Manufacturing Company v. Louisville and Nashville Railroad Company*, 281 F.Supp. 944 (E.D.Tenn.1967):

> [U]nder the rule of *Hadley v. Baxendale*, (1954) 9 Ex. 314, 156 Eng. Reprint 145, 5 Eng.Rul.Cas. 502, damages recoverable for breach of contract are (1) such as may fairly and reasonably be considered as arising in the usual course of events from the breach of the contract itself or (2) such as may reasonably be supposed to have been in the contemplation of the parties at the time they made the contract ... See *Clark v. Ferro Corp.*, *supra*, 237 F.Supp. [230] at p. 238. The rule has been stated in terms of "foreseeability" in the Restatement of Contracts (Sec. 330):
>
> > In awarding damages, compensation is given for only those injuries that the defendant had reason to foresee as a probable result of his breach when the contract was made. If the injury is one that follows the breach in the usual course of events, there is sufficient reason for the defendant to foresee it; otherwise it must be shown specifically that the defendant had reason to know the facts and to foresee the injury.

The statement providing for "special" or "consequential" damages is merely a further extension of "foreseeability." McCormick, in speaking of the rule of *Hadley v. Baxendale*, observes:

> This standard is in the main an objective one. It takes account of what the defendant who made the contract might have foreseen as a reasonable man, in the light of the facts known to him, and does not confine the inquiry to what he actually did foresee. I[f] the loss claimed is unusual, then it becomes necessary to ascertain whether the defaulting party was notified of the special circumstances * * * McCormick on Damages, p. 565, sec. 138.

At Pages 947, 948.

■ Defendant had vast experience in the hauling and the delivery of grain. It, through employees, knew the importance of the order in which the cars were to be delivered, and that Stroh received malt and corn grits for the purpose of making beer.

Thus, applying the *Marquette* principals to the instant cause, the Court is of the opinion that the damages, which resulted from the misdelivery of barley to Stroh, were reasonably foreseeable.

The reasonable foreseeableness that the mistake would not be caught is increased because of the similarities in the numbers on the cars and the similarities in the appearance of the contents within the cars.

Although it is clearly obvious that Plaintiff was not free from negligence, the Court disagrees with Defendant's position that the only forseeable consequence which would normally arise from the misdelivery of the cars was that (1) Stroh would have discovered the wrong car and (2) rejected delivery, resulting in only a minor inconvenience to Stroh and Grand Trunk. The Court believes that implicit in such a defense is the admission that it was also foreseeable that the mistake would not be caught by Stroh.

1. The Rickel claim was assigned to Plaintiff.

The Court believes that the *Marquette* case, wherein Plaintiffs' claim for special or consequential damages under the Carmack Amendment was not allowed by the Court, is similar to, but distinguishable from, the instant case. In *Marquette*, the Plaintiff regularly sold and shipped cement to Vulcan Materials Company at its two separate Chattanooga plants. One of the plants manufactured ready-mix concrete while the other manufactured only concrete pipe. A carload of "air-entrained" cement, suitable only for utilization in making concrete pipe, was shipped by Marquette via a bill of lading consigning it to Vulcan's concrete pipe division. Due to an error in routing, the railroad misdelivered the carload of "air-entrained" cement, sending it to Chattanooga Rock Products, the ready-mix concrete division. The ready-mix concrete made from this cement was defective and had to be replaced. Chattanooga Rock Products and Marquette then brought suit against the railroad to recover the damages which resulted when the contents of the misdelivered shipment were used in the manufacturing process for which they were unsuited. The Court awarded the Plaintiff the value of the shipment and the freight charges but refused to award any other damages. With regard to the special or consequential damages that were not awarded, the Court stated as follows:

> With respect to the remaining items of damage claimed by the plaintiffs, that is the cost of testing and removing the defective concrete from construction sites, such damages may only be considered as special or consequential damages. With respect to their recovery the issue then arises as to whether the special circumstances giving rise to the damages were communicated to or known by the defendant at the time the contract of carriage was made. In order to recover special damages under the circumstances of this case, it must appear that at the time of the making of the contract of carriage the defendant had reasonable notice or knowledge of the special conditions rendering such damages the natural and probable result of the breach. *Illi-

nois Central Ry. Co. v. Johnson & Fleming*, 116 Tenn. 624, 94 S.W. 600. *Machine Co. v. Union Compress & Storage Co.*, 105 Tenn. 187, 58 S.W. 270. *See also Kerr Steamship Co., Inc. v. R. C. A.*, 245 N.Y. 284, 157 N.E. 140, 55 A.L.R. 1139; 13 Am.Jur.2d "Carriers", Sec. 447. The Court is of the opinion that the evidence does not establish such notice or knowledge upon the part of the defendant. It is true that the bill of lading did designate the shipment as "air-entrained cement." This information is not sufficient, however, to put the carrier on notice as to the use for which it was to be put. Nor was it sufficient to put the carrier on notice that an additional air-entraining agent would be added to the cement by the plaintiff, thereby rendering it unsuited for structural use. The notice here received by the carrier by the inclusion of the words "air-entrained cement" upon the bill of lading was not sufficient to render reasonably foreseeable the subsequent events which resulted in the expenses incurred by the plaintiff in testing and removing the defective concrete.

At Pages 950, 951.

In *Marquette*, unlike the case at bar, the only knowledge or notice that the Defendant had with regard to the operation of the Plaintiffs, the shipment or its intended use was the bill of lading which include the words "air-entrained" cement:

> The bill of lading showed that the cement was air-entrained, but the train clerk at the L & N who rerouted the shipment from Concrete Pipe to Rock Products had not noted that the cement was air-entrained, and in fact was uninformed as to what the designation meant. He was likewise uninformed as to what use the Vulcan Materials Company made of the concrete it received at either of its two divisions or as to any difference in the concrete received at the two divisions.

In the instant case, Defendant had that much knowledge and more. It is not necessary that Defendant have detailed knowledge of the damages incurred. On the oth-

er hand, it is sufficient that Defendant possess sufficient notice of the facts and circumstances which would render damages probable. *Dale Truck Line v. R. & M. Well Servicing and Drilling Co.*, 286 S.W.2d 446 (Tex.Civ.App.1956); *L. E. Whitlock Truck Service, Inc. v. Regal Drilling Company*, 333 F.2d 488 (10th Cir. 1964).

In *L. E. Whitlock Truck Service, Inc. v. Regal Drilling Company, supra,* the Court affirmed an Order of the district court which granted an award of special damages of lost profits for delay in delivery. In that case, an oil rig was being transported by a carrier who specialized in, and was experienced in, hauling oil rigs. The carrier knew it was the shipper's only oil rig. In finding for the shipper, the Court reasoned as follows:

> There is adequate testimony in the record to support the award of special damages. The appellant specialized in and was experienced in the hauling of oil well equipment and was aware of the importance of time to those engaged in the drilling business. There is adequate evidence in the record to support the finding that the appellant knew of the need and the importance to the appellee of delivery of the rig on time and of damages which would result in the event appellee did not have the use of it. The appellant knew that the appellee had only the one drilling rig. Thus the appellant knew the circumstances upon which the special damages here awarded are based.

At Page 492.

█ Stroh has also urged that Grand Trunk's admitted contractual breach makes it strictly liable for the damages which were sustained. In support of this theory, Plaintiff relies upon the unique rules which govern the liability of common carriers for breaches of contracts of carriage. A common carrier is generally liable to a consignee without any proof of negligence if the consignee can establish that the goods, which were delivered to the common carrier, were either not received or were received in a damaged condition, unless the carrier can show that the damage was

caused by the shipper, acts of God, a public enemy, public authority, or the inherent vice or nature of the commodity. *United States v. Gulf, Mobile and Ohio Railroad Co.*, 259 F.Supp. 704, 707 (1966), *aff'd* 391 F.2d 545 (5th Cir. 1968). An exception to the carrier's liability also exists in cases where the consignee was negligent. *Carter v. St. Louis San Francisco Railroad Co.*, 179 Ark. 865, 18 S.W.2d 376, 380 (1929); *Husky Hi-Power, Inc. v. Salt Creek Freightways,* 366 P.2d 1003 (1961). In those instances where the carrier satisfies an exception, the burden of proving negligence reverts to the Plaintiff. The Plaintiff must then prove that the carrier was actually negligent. In the instant case, Plaintiff argues that Grand Trunk's admitted negligence makes it strictly liable without regard to the issue of its own contributory negligence. *McCurdy v. Union Pacific Railroad Co.*, 68 Wash.2d 457, 413 P.2d 617 (1966); *Albrecht v. Groat*, 91 Wash.2d 257, 588 P.2d 229 (1978).

█ The cases that are relied upon by Plaintiff involve circumstances where the damage occurred while the merchandise was in the possession of a carrier. The rationale behind these cases is that a carrier, who has control over, and access to information relating to, the handling and carriage of goods, should carry the burden of proof if it can be established that the damage occurred to the lading while in its possession. Inasmuch as all of the alleged damages occurred after delivery when the transportation process had been completed, and while in the presumptively exclusive possession and control of Plaintiff, the Court believes that this line of authority is distinguishable from the case at bar. Therefore, the Court finds that Defendant is not strictly liable for the special or consequential damages which were incurred due to the breach of the Stroh contract of carriage, but that the foreseeability tests in *Marquette* are applicable.

Regarding the Rickel contract of carriage, Rickel has a claim against Defendant for breach of its contract of carriage under 49 U.S.C. § 20(11) and 49 U.S.C. § 11707, as

recodified. Stroh took an assignment of that contract claim for the sum of $13,-396.90, the value of the claim. Stroh now seeks to recover for the value of the bulk barley car as a result of its breach of the Rickel contract of carriage, relying upon the *Marquette* case, *supra.* Grand Trunk argues that the alleged assignment of Rickel's contractual claim to Stroh is, in reality, a complete satisfaction of the claim. More specifically, Grand Trunk contends that (1) if Rickel pursued its claim against Defendant, it would have had to proceed against Stroh for conversion; (2) where a party who is guilty of conversion attempts to take assignment of the owner's claim against all wrongdoers, the payment under such an "assignment" acts as a complete satisfaction and not an assignment, *Upham v. Dickinson*, 38 Mich. 338 (1878); and (3) Rickel made an election of remedies by claiming for the value of the converted barley against Stroh and receiving complete satisfaction of the claim. *See Ielmini v. Bessemer National Bank*, 298 Mich. 59, 298 N.W. 404 (1941).

█ The Court believes Defendant's initial defense (i. e., action against Stroh for conversion) to be incorrect. As a matter of law, Grand Trunk would not have a claim of indemnification against Stroh because a claim of indemnification requires that the party who seeks indemnification must be totally free from fault. *See Gulick v. Kentucky Fried Chicken*, 73 Mich.App. 746, 749, 252 N.W.2d 540 (1977); *Provencal v. Parker*, 66 Mich.App. 431, 239 N.W.2d 623 (1976); *McLouth Steel Corp. v. A. E. Anderson Construction Corp.*, 48 Mich.App. 424, 210 N.W.2d 448 (1973), *lv. den.* 391 Mich. 754 (1973). In *Provencal v. Parker, supra*, the Court set forth the principles of indemnity as follows:

> Indemnification rests upon the equitable principle of a right to restitution. *Dale v. Whiteman* [388 Mich. 698, 202 N.W.2d 797 (1972)]. The theory of indemnity is that where the wrongful act of one results in liability being imposed on another, such other person may have indemnity from the person actually guilty of the wrong.

*Hart Twp. v. Noret*, 191 Mich. 427, 158 N.W. 17 (1916); *Detroit, GH & MR Co. v. Boomer*, 194 Mich. 52, 160 N.W. 542; *Village of Portland v. Citizens Telephone Co.*, 206 Mich. 632, 173 N.W. 382 (1919); *Indemnity Insurance Co. of North America v. Otis Elevator Co.*, 315 Mich. 393, 24 N.W.2d 104 (1946). The party seeking indemnity must plead and prove freedom on his part from personal fault. *Indemnity Insurance Co. of North America v. Otis Elevator Co.*, supra, *Husted v. Consumers Power Co.*, 376 Mich. 41, 135 N.W.2d 370 (1965). This has been interpreted to mean that the party seeking indemnity must be free from active or casual negligence, *McLouth Steel Corp. v. A. D. Anderson Construction Corp.*, 48 Mich.App. 424, 210 N.W.2d 448 (1973), lv. den. 391 Mich. 754 (1973); *Nanasi v. General Motors Corp.*, 56 Mich.App. 652, 224 N.W.2d 914 (1974). There is no right of indemnification between actual joint tortfeasors or tortfeasors in pari delicto. *Detroit, GH & MR Co. v. Boomer*, supra, *Village of Portland v. Citizens Telephone Co.*, supra.

Grand Trunk, having admitted negligence, cannot be said to be totally free from responsibility in this cause.

█ Addressing the Defendant's second defense, the Court believes that *Upham v. Dickinson, supra*, is distinguishable from the instant case and does not provide a basis upon which to deny the claim for the Rickel assignment. In *Upham*, a partnership logged a parcel of property which the partners erroneously believed to have been owned by one of them. When it was discovered that none of the partners owned the property, one partner approached the legal owner of the property and, in exchange for consideration, received an assignment of the land owner's cause of action for damages. The partner then sued his co-partners for the entire amount of the damage. The Court held that the land owner's claim had not been assigned, but it had been fully satisfied and, therefore, extinguished. The Court believes that *Upham* is distinguishable from the instant cause for the reason that *Upham* involved the assign-

ment of a tort claim (i. e., trover for the conversion of a quantity of logs), while the case at bar involves the assignment of a contract of carriage claim. The assignment of contract claims was specifically determined by the *Upham* Court as not having been satisfied.

> It is said, however, that some exceptions have been recognized, and that this case is within them. The case of *Low v. Blodgett*, 21 N.H., 121, is referred to. That was a case in which a surety on a note purchased it, and had it transferred to a third person in trust for himself. His right to do this was sustained; but we do not perceive that the case has any bearing upon the question at issue here. It shows, indeed, that a party may in some cases satisfy a demand and still keep it alive for the purposes of a remedy against others; but the case was not one of tort, and the principle involved was a familiar and very salutary one in the laws of contracts.

At Page 340.

Although Grand Trunk contends that there is an underlying tort claim because of an alleged conversion by Stroh which would bring the case within the rule of *Upham*, this Court believes that the instant cause is distinguishable from *Upham*. The instant case, unlike *Upham*, involves the casual and negligent act of a third party, Grand Trunk, who initially misdelivered and breached its contract of carriage.

■ Considering Grand Trunk's third defense, the Court does not believe that the assignment is a sham because there has been an election of remedies by Rickel. Grand Trunk argues that Rickel, by receiving payment from Stroh for the value of the converted barley prior to the assignment and prior to the commencement of this lawsuit, received satisfaction of that claim and made an election of remedies. Therefore, it is argued that Stroh is precluded from prevailing on the assigned claim because Rickel could not have recovered from both Stroh and Grand Trunk for the loss of the same carload of barley. *See Ielmini v. Bessemer National Bank*, 298 Mich. 59, 298 N.W. 404 (1941).

In *Ielmini*, members of a local lodge brought suit against the Defendant bank to recover damages for funds that the bank should have had in its possession. The action was brought subsequent to Plaintiffs' unsuccessful attempt to recover upon a judgment in a previous action against the bank treasurer and others on the basis of a different theory of liability. The Court held that the doctrine of remedies precluded maintenance of the subsequent action against the bank.

The general rule concerning the election of remedies is well stated in 25 Am.Jur.2d Election of Remedies, § 1, pp. 646–647, wherein it is said:

> An election of remedies has been defined as the act of choosing between two or more different and coexisting modes of procedure and relief allowed by law on the same state of facts. The phrase is also used in a more restrictive sense to denote the doctrine that the adoption, by an unequivocal act, of one of two or more inconsistent remedial rights has the effect of precluding a resort to the others. The doctrine is not a rule of substantive law but rather is a technical rule of procedure or judicial administration. It is equitable in nature, and applies both to offensive and defensive remedies.

The purpose of the doctrine of election of remedies is not to prevent recourse to any remedy, but to prevent double redress for a single wrong. Its rationale is that courts will not permit suitors solemnly to affirm that a given state of facts exists from which they are entitled to a particular relief and afterward affirm or assume that a contrary state of facts exists, from which they are entitled to inconsistent relief. One may not take contradictory positions in asserting a right in court if the assertion of the plaintiff's first right involves a negation of the right as claimed in the second case. In this connection the language of the Scottish law—that a man shall not be allowed to approbate and reprobate—is sometimes used.

The Court does not believe that the doctrine of election of remedies is applicable to the case at bar. Moreover, *Ielmini* is distinguishable to the instant cause, and, therefore, inapplicable here. Stroh's mere act of making a payment to Rickel for the value of the Rickel car was an out-of-court arrangement which did not involve the assertions of rights and theories of liability. Such action does not constitute an election of remedies.

Based upon the foregoing analysis, it is, therefore, ordered that Stroh shall be, and is, allowed to recover the sum of $19,198.99 from Grand Trunk for the breach of the Stroh and Rickel contracts of carriage.

The foregoing constitutes the Court's findings of fact and conclusions of law as required by *Fed.R.Civ.P.* 52.